*This opinion is subject to revision before
publication in the Pacific Reporter*

**2016 UT 28**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

FORT PIERCE INDUSTRIAL PARK PHASES II, III & IV OWNERS ASSOCIATION,
*Appellant and Cross-Appellee,*

*v.*

THOMAS A. SHAKESPEARE; GLORIA J. SHAKESPEARE;
GLOCO, LC; ATLAS TOWER, LLC,
*Appellees and Cross-Appellants.*

No. 20140137
Filed June 22, 2016

On Direct Appeal

Fifth District, St. George
The Honorable Thomas M. Higbee
No. 100500378

Attorneys:

Linda M. Jones, Troy L. Booher, Clemens A. Landau, Salt Lake City,
Robert D. Mitchell, St. George, for appellant

David L. Elmont, M. Eric Olmstead, St. George, for appellees

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
and JUSTICE DURHAM joined.

JUSTICE JOHN A. PEARCE became a member of the Court on
December 17, 2015, after oral argument in this matter,
and accordingly did not participate.

JUSTICE HIMONAS, opinion of the Court:

**INTRODUCTION**

¶ 1  This case is about the authority of the Board of Trustees (Board) of the Fort Pierce Industrial Park Phases II, III & IV Owners Association (Association) to deny an application to construct a cell phone tower on a specific lot in the Fort Pierce Industrial Park. The lot in question is located along River Road, which is "the most aesthetically sensitive area of the" industrial park. In 2009, Gloria and Thomas Shakespeare; GLOCO, LC; and Atlas Tower, LLC (collectively, Shakespeares) applied for permission from the Board to construct a cell phone tower on that lot. Despite the denial of their application, the Shakespeares proceeded to construct the cell phone tower. The Association then brought suit against the Shakespeares in district court for breach of the CC&Rs.[1]

¶ 2  Following a bench trial, the district court held that the Shakespeares breached the CC&Rs by constructing the cell phone tower without permission from the Board. However, the district court also applied a presumption that "restrictive covenants are not favored in the law and are strictly construed in favor of the free and unrestricted use of property" and held that the Board did not have the right to limit the number of cell phone towers in the industrial park. Additionally, the district court found that the Board could consider aesthetics and the two-business limit but held that the Board did not "reasonably consider" these factors in making its decision.

¶ 3  As explained below, we hold that the court erred in strictly construing the CC&Rs rather than applying neutral principles of contract construction. Thus, we reverse the district court's holding regarding the Board's authority to deny the Shakespeares' application and instead hold that the Board had sufficient authority under the CC&Rs to deny that application. We also affirm the district court's grant of summary judgment regarding the timeliness of the Board's denial, and we strike the attorney fees award and remand for a determination of attorney fees in light of this decision.

---

[1] The covenants, conditions, and restrictions (CC&Rs) of the Fort Pierce Industrial Park are restrictive covenants set forth in the Fourth Amendment to and Restatement of the Declaration of Covenants, Conditions and Restrictions of Fort Pierce Industrial Park Phases II, III & IV.

## BACKGROUND

¶ 4    The Fort Pierce Industrial Park was created as "an attractive development option for companies seeking to start or expand businesses." It is a "very nice industrial park" in Washington County, Utah, and is "intended . . . to be a cut above the norm." The Board has authority to "enforce and administer the [CC&Rs]," which bind owners and operators within the industrial park. The purpose of the CC&Rs is to "establish a general plan for the improvement and development of the [Fort Pierce Industrial Park] Property[,] to [e]nsure adherence thereto so as to avoid improper development and use of the Property[,] and to provide adequately for consistent quality of improvement and use." Among other things, the CC&Rs "require that external equipment be shielded" and impose "maintenance requirements, prohibitions against hazards, and parking and signage requirements."

¶ 5    Under the CC&Rs, property owners in the industrial park must apply to the Board for written approval "[b]efore commencing the construction or alteration of any buildings . . . or any other structures or permanent improvements." After the owner has submitted the required plans, the Board has "the right to refuse to approve any such plans and specifications." In making its determination, the Board may consider the following factors: "the suitability of the proposed structure, the materials of which it is to be built, the site upon which it is proposed to be erected, the harmony thereof with the surroundings, and the effect of said building, or other planned structure, on the outlook from adjacent or neighboring property." The Board is "guided by [the CC&Rs], the ordinances of the City of St. George, including the Uniform Building Code as adopted, and other applicable rules and regulations" and has "the power to enforce its decision."

¶ 6    Both the St. George city ordinances and the CC&Rs emphasize aesthetic considerations at the planning stage. Chapter 22 of the city ordinances is titled "Wireless Telecommunication Facilities" and addresses "planning issues, particularly aesthetic concerns, brought on by the demand for wireless communication facilities." ST. GEORGE, UTAH, CITY CODE § 10-22-1(A) (2016). The regulations in that chapter "are intended to minimize the visual impact of wireless communication facilities." *Id.* § 10-22-1(B). They include a city policy "to encourage collocation of facilities wherever feasible," with up to three providers permitted in a single tower; if collocation is not feasible, the burden is on the applicant to demonstrate infeasibility. *Id.* § 10-22-7(B). As to the CC&Rs, in addition to the considerations already listed, they restrict permitted uses of the property to "selected industrial, manufacturing

and marketing enterprises that are compatible with the development" and to "aesthetically attractive and harmonious structures." The CC&Rs seem to pay particular attention to River Road, indicating that "to provide for an overall aesthetic project, Lots that face River Road may be subject to additional specific landscaping standards." The CC&Rs also limit the number of businesses per lot, requiring "specific written consent of the Board" for more than two simultaneous tenants or users or for more than two businesses to be conducted simultaneously on a single lot.

¶ 7    The events giving rise to this case transpired after the Board learned of "a problem with cell phone coverage" in the industrial park in early 2008 and was approached by a couple of cell phone service providers. Before the Shakespeares applied for permission to construct the cell phone tower at issue in this case, two other cell phone tower developers had sought permission to build cell phone towers in the Fort Pierce Industrial Park. At the beginning of 2008, Alltel Communications' (Alltel) cell phone tower proposal was approved by the Planning Commission of St. George,[2] but Alltel "abandoned the project for cost reasons" without submitting a plan to the Board for approval. A few months later, InSite Towers, LLC, (InSite) approached the Board and inquired about constructing a cell phone tower in the industrial park. InSite and the Board discussed possible locations for several months; InSite suggested a couple of locations along River Road, but the Board discouraged InSite from locating a cell phone tower there because of concerns about visibility, aesthetics, and the two-business limit and because that area "was just very sensitive." The Board finally approved a non–River Road location on the west boundary of the industrial park where InSite's cell phone tower "would not be along the ridge line" and would be "kind of concealed."

¶ 8    In 2009, the Shakespeares applied to construct a cell phone tower on their lot, which is located on River Road. The lot is comparatively small and already had two businesses on it. The Shakespeares first obtained approval from the city and then sought approval from the Board. The district court found that the Board denied the application because it wanted to limit the number of cell

---

[2] Applicants are required to submit a Wireless Master Plan to the Planning Commission of St. George and to obtain a Conditional Use Permit, as well as receive Board approval, in order to build a cell phone tower in the Fort Pierce Industrial Park.

phone towers "to the minimum number necessary to meet the community needs" and for "other reasons . . . including primarily the aesthetics and the two-business limit." Despite the Board's denial, Gloria and Thomas Shakespeare and GLOCO, LC, permitted Atlas Towers (their lessee) to construct a cell phone tower on the lot, without notifying the Board. In early January 2010, the Board discovered that construction of a cell phone tower had begun on the Shakespeares' lot, and the Board filed a lawsuit against the Shakespeares. The Shakespeares counterclaimed, seeking injunctive relief, damages, and attorney fees.

¶ 9    The district court held that constructing the cell phone tower without Board approval constituted a breach of the CC&Rs. But because the district court found the Board's denial to be "unreasonable and arbitrary," it held that "[t]he tower is approved and allowed to remain." In finding the denial "unreasonable and arbitrary," the district court presumed that restrictive covenants, such as the CC&Rs, are disfavored and should be "strictly construed in favor of the free and unrestricted use of property." According to the district court, the Board breached the CC&Rs "by basing its denial of the Shakespeares' application on use limits not found in the [CC&Rs], and by otherwise unreasonably and arbitrarily denying the application." Specifically, the district court indicated that "Fort Pierce does not have the right under the Restrictive Covenants to limit the number of cell towers within the industrial park." The district court found that the Board acted in good faith and that other concerns factored into the decision, "including primarily the aesthetics and the two-business limit." However, the district court found that the testimony "establishe[d] that the dominant factor in the decision was the preference of one site [InSite's] over the other [the Shakespeares']." Because the district court, based on its strict construction of the CC&Rs, believed that the Board lacked the authority to limit the number of cell phone towers, and because it found that such a limitation was the main reason for the Board's denial of the application, the district court concluded that the denial was improper. The district court also granted partial summary judgment to the Association, holding that the Board's denial was issued within sixty days, as required by the CC&Rs. The district court awarded the Shakespeares 50 percent of their attorney fees.

¶ 10  The Association appealed the judgment to the Utah Supreme Court. The Shakespeares cross-appealed the grant of summary judgment regarding the timeliness of the Board's denial and also cross-appealed the part of the final judgment finding breach by the

Shakespeares and the subsequent "reduc[tion] [of] the grant of the Shakespeares' attorney[] fees by 50%."

¶ 11   We hold that the district court erred in strictly construing the CC&Rs. We reject strict construction of restrictive covenants and hold that restrictive covenants should be construed under the same principles used to interpret contracts. Based on our analysis of the CC&Rs, we reverse the district court's holding that the Board's denial of the Shakespeares' application was improper; instead, we hold that the Board acted within its authority in denying the Shakespeares' application. We affirm the grant of summary judgment regarding the timeliness of the denial. And we strike the attorney fees award and remand for a determination of attorney fees in light of our decision.

**PRESERVATION**

¶ 12   The Shakespeares assert that the question of "whether the trial court erred in finding restrictive covenants to be disfavored" was "not properly preserved on appeal." The Shakespeares also claim that this question "is subject to the invited-error doctrine."

¶ 13   The issue of "whether the trial court erred in finding restrictive covenants to be disfavored" may properly be considered on appeal in this case. An issue is preserved by "present[ing] [it] to the trial court in such a way that the trial court has an opportunity to rule on that issue." *In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 25, 266 P.3d 702 (citation omitted). However, there are "some limited exceptions to our general preservation rule." *Patterson v. Patterson*, 2011 UT 68, ¶ 13, 266 P.3d 828. Because "[o]ur preservation requirement is self-imposed and is therefore one of prudence rather than jurisdiction[,] . . . we exercise wide discretion when deciding whether to entertain or reject matters that are first raised on appeal." *Id.* "The two primary considerations underlying the [preservation] rule are judicial economy and fairness." *Kell v. State*, 2012 UT 25, ¶ 11, 285 P.3d 1133 (alteration in original) (citation omitted). In *Kell v. State*, we pointed out that the "district court not only had an opportunity to rule on the issue [that the State argued was not preserved]" but in fact "did rule on it." *Id.* We indicated that "[t]he district court's decision to take up the question . . . conclusively overcame any objection that the issue was not preserved for appeal." *Id.* This is likewise the case here. The district court began its analysis by discussing "several overarching principles of construction" and specifically considered restrictive covenants, citing to *St. Benedict's Development Co. v. St. Benedict's Hospital*, 811 P.2d 194, 198 (Utah 1991), for the proposition that "restrictive covenants are not favored in the law

and are strictly construed in favor of the free and unrestricted use of property." Here, as in *Kell v. State*, the district court's decision to take up the question conclusively overcame any objection that the issue was not preserved for appeal.

¶ 14 Nor does the invited-error doctrine preclude consideration of the issue of "whether the trial court erred in finding restrictive covenants to be disfavored" in this case. The invited-error doctrine is intended to "ensure[] that parties cannot entice the court into committing an error and then reap the benefit of objecting to that error on appeal." *State v. Moa*, 2012 UT 28, ¶ 25, 282 P.3d 985; *see also State v. McNeil*, 2016 UT 3, ¶ 17, 365 P.3d 699 ("[A]n error is invited when counsel encourages the trial court to make an erroneous ruling. The rule discourages parties from intentionally misleading the trial court so as to preserve a hidden ground for reversal on appeal . . . ." (internal quotation marks omitted)). The Shakespeares appear to argue that the Association enticed the court into committing an error because the Shakespeares "have been unable to identify any instance in the proceedings below . . . where [the Association] cited any legal authority or provided any meaningful explanation of the proper standard the trial court should apply in interpreting the plain language of the CC&Rs." The Shakespeares' approach confuses the concepts of preservation and invited error. Moreover, as we recently expressed, inaction is not a basis for finding invited error. *McNeil*, 2016 UT 3, ¶ 21 ("The State claims that the invited error doctrine is triggered by the fact that defense counsel 'did not dispute' that the statement was not hearsay. The State also terms counsel's conduct as an 'affirmative acquiescence.' . . . The State's argument is unpersuasive because an error of this sort by the trial court is not invited but merely unpreserved, and thus remains subject to plain error review. Because the State's understanding of invited error would erode the doctrine of plain error review and is contrary to our present caselaw, we reject this broad definition of invited error." (citation omitted)). Thus, the invited-error doctrine does not preclude us from reaching the issue regarding the construction of restrictive covenants on appeal.

## STANDARD OF REVIEW

¶ 15 Three standards of review are implicated by the issues raised in this case. First, we review the district court's conclusions of law for correctness. *State v. Tiedemann*, 2007 UT 49, ¶ 11, 162 P.3d 1106. This includes "questions of contract interpretation." *Holladay Towne Ctr., L.L.C. v. Brown Family Holdings, L.L.C.*, 2011 UT 9, ¶ 18, 248 P.3d 452; *Fairbourn Commercial, Inc. v. Am. Hous. Partners, Inc.*, 2004 UT 54, ¶ 6, 94

P.3d 292 ("'[Q]uestions of contract interpretation not requiring resort to extrinsic evidence' are matters of law, which we review for correctness." (citation omitted)).

¶ 16   Second, we review the district court's findings of fact for clear error. *Brown v. State*, 2013 UT 42, ¶ 37, 308 P.3d 486 ("We will set aside a district court's factual finding as clearly erroneous only if it is 'against the clear weight of the evidence, or if [we] otherwise reach[] a definite and firm conviction that a mistake has been made.'" (alterations in original) (citation omitted)). In this case, the district court's application of an erroneous legal standard (i.e., strict construction of restrictive covenants) and incorrect conclusion about what the CC&Rs allowed for (i.e., that the CC&Rs did not permit the Board to limit the number of cell phone towers) caused the district court's "entire approach to [its] analysis" and many of its factual findings to be "unavoidably tainted by [those] misperception[s]." Those factual findings are clearly erroneous, and we owe them no deference.

¶ 17   Third, we review the district court's grant of summary judgment for correctness, with "the facts and all reasonable inferences drawn therefrom [being viewed] in the light most favorable to the nonmoving party," the Shakespeares. *R & R Indus. Park, L.L.C. v. Utah Prop. & Cas. Ins. Guar. Ass'n*, 2008 UT 80, ¶ 18, 199 P.3d 917 (citation omitted).

## ANALYSIS

¶ 18   We begin our analysis by addressing the proper interpretation of restrictive covenants; we reject strict construction of restrictive covenants in favor of applying the rules of construction used for contracts. Then we analyze the CC&Rs for the Fort Pierce Industrial Park and hold that they provided the Board with sufficient authority to deny the cell phone tower application. We discuss the business judgment rule but decline to adopt a precise business judgment standard in this case. We also consider the summary judgment determination regarding the timeliness of the Board's denial of the Shakespeares' application and hold that the denial was timely. Finally, we strike the award of attorney fees to the Shakespeares and remand for a determination of what attorney fees to award the Association.

## I. INTERPRETATION OF RESTRICTIVE COVENANTS

¶ 19   The district court erred in applying strict construction to the CC&Rs. Restrictive covenants are a "method of effectuating private residential developmental schemes" and give property owners in such

developments the right to enforce those covenants against others in the development. *Swenson v. Erickson*, 2000 UT 16, ¶ 21, 998 P.2d 807. In *Swenson v. Erickson*, we indicated that "interpretation of [restrictive] covenants is governed by the same rules of construction as those used to interpret contracts" and that, "[g]enerally, unambiguous restrictive covenants should be enforced as written." *Id.* ¶ 11; *see also View Condo. Owners Ass'n v. MSICO, L.L.C.*, 2005 UT 91, ¶ 21, 127 P.3d 697 ("We interpret the provisions of the Declaration [of CC&Rs] as we would a contract. If the Declaration is not ambiguous, we interpret it according to its plain language." (citation omitted)).[3] Thus, restrictive covenants "should be interpreted to give effect to the intention of the parties

---

[3] The district court cited *Express Recovery Services, Inc. v. Rice*, 2005 UT App 495, ¶ 3 n.1, 125 P.3d 108, for the rule that "[w]hen there is an ambiguity in contract language, we turn first to extrinsic evidence in order to determine the intent of the parties. But in the absence of such extrinsic evidence, which is commonly lacking in the non-negotiated terms of form contracts, we construe the lingering ambiguities against the drafter as a last resort." We note, however, that even if some specific terms may appear ambiguous when interpreted in isolation, that is not sufficient for a finding of ambiguity. *See, e.g.*, *State v. Rasabout*, 2015 UT 72, ¶ 22, 356 P.3d 1258 ("A statute is ambiguous when its terms remain susceptible to two or more reasonable interpretations *after we have conducted a plain language analysis*." (emphasis added) (internal quotation marks omitted)); *Anadarko Petroleum Corp. v. Utah State Tax Comm'n*, 2015 UT 25, ¶ 11, 345 P.3d 648 ("[W]e do not interpret statutory provisions in isolation. We . . . construe terms in each part or section of a statute in connection with every other part or section so as to produce a harmonious whole. The meaning of seemingly unclear or ambiguous provisions is often clear when read in context of the entire statute." (internal quotation marks omitted)). We do not interpret words in a contract in isolation but instead interpret them "in light of the [contract] as a whole." *Utah Farm Bureau Ins. Co. v. Crook*, 1999 UT 47, ¶ 5, 980 P.2d 685 ("Policy terms are harmonized with the [contract] as a whole . . . ."). When the CC&Rs are reviewed as a whole, they clearly provide the Board with the authority and discretion to limit the number of cell phone towers in the industrial park. Therefore, there are no lingering ambiguities to be construed against the drafter of the CC&Rs, and the rule permitting the use of extrinsic evidence and construction of ambiguities against the drafter is not applicable here.

ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created." RESTATEMENT (THIRD) OF PROP. (SERVITUDES) § 4.1(1) (AM. LAW INST. 2000). The Restatement indicates that

> [t]he rule that servitudes should be interpreted to carry out the intent of the parties and the purpose of the intended servitude departs from the often expressed view that servitudes should be narrowly construed to favor the free use of land. It is based in the recognition that servitudes are widely used in modern land development and ordinarily play a valuable role in utilization of land resources.

*Id.* cmt. a. This analysis applies to CC&Rs, which are used in modern land development and play a valuable role in establishing and enforcing plans for the improvement and development of properties such as the Fort Pierce Industrial Park. The district court, however, incorrectly believed itself to be bound by the earlier proposition, which appears as dicta in *St. Benedict's Development Co. v. St. Benedict's Hospital*, that "restrictive covenants are not favored in the law and are strictly construed in favor of the free and unrestricted use of property." 811 P.2d 194, 198 (Utah 1991). We continue to reject strict construction of restrictive covenants and make it clear that restrictive covenants are to be interpreted using the same rules of construction that are used to interpret contracts.

## II. BOARD AUTHORITY UNDER THE CC&RS TO LIMIT THE NUMBER OF CELL PHONE TOWERS AND BUSINESSES

¶ 20   In applying the wrong standard, the district court erroneously determined that the CC&Rs "did not provide the Board discretion to limit the number of cell towers [in the Fort Pierce Industrial Park], and . . . did not provide the Board discretion to deny the Shakespeares' application based upon either the aesthetic impact of the location of the cell tower or the density restrictions for the lot."[4] When analyzed under

---

[4] The district court also found that the Board's denial of the Shakespeares' application was unreasonable, arbitrary, and capricious because the Board "based its decision on [the] fundamentally incorrect premise" that it can limit the number of cell phone towers in the

con't.

principles of contract construction, however, the CC&Rs clearly provided the Board with sufficient authority and discretion to deny the cell phone tower proposal.[5] The CC&Rs allow the Board discretion to consider the need for an additional cell phone tower and the possibility for collocation of such facilities, the aesthetic impact of the cell phone

---

industrial park. However, the district court clearly erred in making this determination, because the district court "based its [finding] on a fundamentally incorrect premise." Contrary to the district court's contention, the Board does have such authority and discretion. *See infra* ¶¶ 20–23.

[5] The Shakespeares seek to discount the Association's contract interpretation arguments by claiming that the Board's application of the CC&R provision would be relevant only if the language of the CC&Rs were ambiguous. According to the Shakespeares, the question of whether the CC&Rs are ambiguous was not preserved. However, the question of ambiguity was in fact preserved for the same reasons the restrictive covenant question was preserved. *See supra* ¶¶ 12–14. The district court directly addressed the question of ambiguity, starting its analysis by first discussing the construction of ambiguity in contract language. *Kell v. State*, 2012 UT 25, ¶ 11, 285 P.3d 1133 ("The district court's decision to take up the question . . . conclusively overcame any objection that the issue was not preserved for appeal."). Thus, because the court took up the question of ambiguity, the Association had no need to take separate action in order to preserve that question for appeal.

Whether that question was preserved, however, is irrelevant to our analysis. In our analysis, it is not a question of whether the CC&Rs are ambiguous but of whether the language of the CC&Rs is broad enough to allow the Board to exercise its discretion to deny the Shakespeares' cell phone tower application. And when interpreting the language in harmony with all the provisions in the CC&Rs, it is clear that the Board had authority to deny the application. The CC&Rs explicitly grant the Board the authority and duty "to approve or disapprove building plans, specifications, [and] site plans," and nothing in the CC&Rs suggests that the individual property owners are granted maximum freedom to use their property in the industrial park as they desire. To the contrary, the CC&Rs focus on the broad authority of the Board and restrictions on the property owners. *See, e.g.*, *supra* ¶¶ 5–6; *infra* ¶¶ 20–25.

tower, and the two-business limit, which support the Board's decision to deny the Shakespeares' proposal.[6]

¶ 21  Under the CC&Rs, the Board had authority to consider the need for an additional cell phone tower and the possibility for collocation. The CC&Rs indicate that the Board has the right to consider a number of factors, including "the suitability of the proposed structure." Furthermore, as noted, the CC&Rs indicate that it is the intent of the CC&Rs "to protect the character of the Property" and that the Board should be guided by the St. George city ordinances. Chapter 22 of the city ordinances, "Wireless Telecommunication Facilities," is particularly pertinent here. The regulations in that chapter include a city policy "to encourage collocation of facilities wherever feasible," with up to three providers permitted in a single tower. ST. GEORGE, UTAH, CITY CODE §§ 10-22-4, 10-22-7(B) (2016). The testimony of Mr. Jennings, a Board member, shows that these provisions were indeed taken into consideration in the Board's decision-making process. Mr. Jennings testified that "there was a community development concern about proliferation of towers" and that "he understood the community policy, primarily originating with St. George City, to be one of restraint in communication tower approval." Clearly, under the CC&Rs, the Board has authority to consider the city ordinances, and clearly those ordinances seek to prevent unnecessary proliferation of cell phone towers and promote collocation.[7]

---

[6] Our interpretation of the Board's authority under the CC&Rs is further buttressed by section 7.5 of the CC&Rs, which provides that the "provisions . . . shall be liberally construed to effect all of their intended purposes." The Board is tasked with "protect[ing] the character of the Property" and has the right to consider the suitability of any structures proposed for any lot in the industrial park. Thus, a liberal construction to effect these and other intended purposes of the CC&Rs clearly supports the Board's authority to deny the cell phone tower application at issue in this case. While section 7.5 buttresses our conclusion, liberal construction is not necessary to reach our conclusion; standard contract interpretation alone shows the Board to have acted within its authority in limiting the number of cell phone towers to those actually needed.

[7] We recognize that St. George had already granted the Shakespeares its approval to construct the cell phone tower. *See supra* ¶ 8. The Shakespeares argue that the Board, in taking the St. George city

con't.

¶ 22 Because the Board had approved a suitable site for another provider, InSite, to build a cell phone tower, it was reasonable and within the Board's discretion for the Board to consider whether the industrial park needed another cell phone tower and whether collocation was feasible,[8] when considering the Shakespeares' application. Nothing in the record suggests that more than one provider was expected to use InSite's cell phone tower at the time. Under these facts, the Board acted reasonably and within its discretion in deciding that an unneeded second cell phone tower was unsuitable for the industrial park and therefore denying the application. The district court erroneously held that the Board cannot "limit the number of cell towers within the industrial park" and that the proposed project should be "reviewed on the merits as if there were no other communications tower in the industrial park." This holding does not appear to comport with the city ordinances' encouragement of collocation of wireless communication facilities. If the Board were required to ignore the InSite cell phone tower when considering the Shakespeares' proposal, it would be impossible for the Board to be

---

ordinances into account in its decision to deny the Shakespeares' proposal, "reject[ed] the lawful determinations of a relevant government authority" and sought to "override the effect of the government authority's determination." The Shakespeares' characterization of the Board as acting as a "private board of adjustment" or a "private appeal authority" is erroneous. The Board did not review the city's determination to approve the Shakespeares' proposal and did not override the effect of that determination. Instead, the Board considered whether to grant the separate Board approval that is also required for such projects in the industrial park. *See supra* ¶ 7 n.2. Contrary to the Shakespeares' contention, the city's decision does not constitute binding precedent for the Board. The CC&Rs require that the Board "will be guided by . . . the ordinances of the City of St. George," and the Board was free to interpret and be guided by those ordinances regardless of whether the city, also guided by those ordinances, chose to grant its approval for the project.

[8] The St. George city ordinances provide that if collocation is not feasible, the burden is on the applicant to demonstrate infeasibility. ST. GEORGE, UTAH, CITY CODE § 10-22-7(B) (2016). Nothing in the briefing or the district court's decision indicates that the Shakespeares met that burden.

guided by the city ordinances' collocation preference when exercising its discretion in deciding whether to approve or deny the proposal, which would contravene the CC&Rs.

¶ 23   Section 6.4(i) of the CC&Rs further underscores the Board's broad authority to limit the use of properties in the industrial park. The CC&Rs give the Board authority to "approve or disapprove building plans, specifications, or site plans." Section 6.4 emphasizes the breadth of that authority by listing certain uses that are "expressly prohibited." Section 6.4(i) prohibits "the manufacturing, storage, or sale of milk products or milk substitutes" and provides an exception to this express prohibition by permitting such operations on one specific lot. This prohibition of a specific type of business, combined with the exception for a single lot, recognizes the Board's broad authority: the Board has broad discretion, and section 6.4(i) limits that discretion in regard to dairy businesses. The district court considered this prohibition but got the analysis exactly backwards. According to the district court, if the Board's authority to approve or deny plans "[w]ere . . . as broad as [the Association] claims it to be, Section 6.4(I) [sic] would be unnecessary. Had the Restrictive Covenants been intended to limit the number of communication towers in the industrial park, it could have been done specifically, as it was with dairy products." The district court's reliance on this section to support its view of more limited Board authority is entirely misplaced. As already indicated, section 6.4(i) prohibits a particular type of business and provides a specific exception to that prohibition. If section 6.4(i) were not included in the CC&Rs, the Board would have as broad discretion in approving or denying plans for dairy operations as it has in approving or denying plans for any business not prohibited by the CC&Rs. Thus, rather than showing the Board's overall authority to be limited, this section emphasizes the broad discretion of the Board to approve or deny proposals such as the Shakespeares'.[9]

---

[9] Because the district court and the Shakespeares misapprehend the significance of section 6.4(i), the Shakespeares' reliance on that section for an *inclusio unius* argument is erroneous. Under *inclusio unius*, the "expression of one term or limitation is understood as an exclusion of others." *Nevares v. M.L.S.*, 2015 UT 34, ¶ 31, 345 P.3d 719. The Shakespeares argue that since "[s]ection 6.4(i) . . . limits the number of dairy product operations in the industrial par[k] to one[,] . . . [t]he absence of a 6.4(i)-equivalent provision for cell towers or other types of

con't.

¶ 24 The Board also had discretion to consider the aesthetic impact of the cell phone tower and the two-business limit. Of these two considerations, we address only the two-business limit, which provides a particularly clear basis for the Board's denial.[10] The CC&Rs require "specific written consent of the Board" for more than two simultaneous tenants or users or for more than two businesses to be conducted simultaneously on a single lot. As the district court correctly recognized, this rule means that "you can only have two businesses on any lot. To have more than two, the Board has to grant approval." The Shakespeares' lot already had two businesses on it. *Supra* ¶ 8. Because the cell phone tower constituted a third business on their comparatively small lot, the Shakespeares needed the written consent of the Board

---

business indicates the absence of any 'general plan' prohibiting duplicates." However, since section 6.4(i) is actually an exception to the Board's otherwise broad authority to approve and disapprove plans, the Shakespeares' *inclusio unius* argument fails.

The Shakespeares' reliance on another canon of construction, *ejusdem generis*, is likewise misplaced. "[T]his canon posits that general catchall terms appearing at the beginning or end of an exemplary statutory list are understood to be informed by the content of the terms of the list." *State v. Bagnes*, 2014 UT 4, ¶ 18, 322 P.3d 719. The Shakespeares argue that the phrase "protect the character of the Property" at the end of section 2.2 of the CC&Rs, which sets forth the purpose and intent of the CC&Rs, is subject to *ejusdem generis*. They argue that "[t]he specific provisions in section 2.2 do not at all address competitive concerns about the 'need' for any particular number of businesses of a particular type." However, the "specific provisions" listed before the "protect the character of the Property" provision are, for the most part, contained in a sentence that is separate and apart from that provision and do not constitute an exemplary list that limits its meaning. Thus, the Shakespeares' *ejusdem generis* argument fails.

[10] Because we conclude that the district court misinterpreted the CC&Rs and that the Board acted within its authority in limiting the number of cell phone towers in the industrial park and in enforcing the two-business limit, we need not and do not reach the question of aesthetics.

granting an exception to the two-business limit. *Id.* The Board acted within its authority in choosing not to grant the exception.[11]

¶ 25  Thus, when analyzing the CC&Rs as a contract, rather than strictly construing them "in favor of the free and unrestricted use of property," it is clear that the Board acted within its authority in denying the Shakespeares' cell phone tower proposal. The Board considered the need for an additional cell phone tower and the possibility for collocation of such facilities, the aesthetic impact of the cell phone tower, and the two-business limit, and the Board acted within its discretion in denying the Shakespeares' proposal based on these considerations.

### III. BUSINESS JUDGMENT RULE

¶ 26 The parties have argued extensively over the precise formulation of the business judgment standard applicable to this case, and the district court considered the business judgment rule in its judgment below. However, we agree with the Shakespeares that "the adoption of a precise business judgment standard is not actually necessary in order to decide this case." Regardless of the formulation of that standard, it is clear that the district court erred in its determination that the Board's decision failed to satisfy the business judgment rule.[12] The district court provided two reasons in support of its determination.

---

[11] In its decision, the district court indicated that "[i]n their testimony, Mr. Jennings and Mr. Pasley [two of the Board members] both discussed the purposes for the two-business limit, but only generally." The district court also recognized that "Mr. Jennings pointed out that the [Shakespeares'] lot is comparatively small at three acres." However, the district court concluded that "[n]one of the general concerns raised even remotely apply to this use" and that therefore the decision was not reasonably considered. As discussed in this opinion, the district court's reasoning is suspect, and the district court appears to have placed the burden of proof on the wrong party. *See infra* ¶ 28.

[12] We also note that the district court correctly recognized that "[t]here is considerable room for debate on what is reasonable and what is not reasonable in a business context" and that "the court . . . must be careful not to substitute its judgment for that of [the Board]." *See, e.g., Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994) ("[C]ourts will not substitute their business judgment for

con't.

¶ 27 First, the district court held that the Board "based its decision on a fundamentally incorrect premise," namely "the improper notion that it had the right to limit the number of cell towers." Therefore, the district court concluded that "the action was unreasonable, arbitrary, and capricious." However, as already discussed, the district court misinterpreted the CC&Rs. *See supra* ¶¶ 20–23. The CC&Rs do in fact give the Board the right to limit the number of cell phone towers. Therefore, the Board's basing its decision on the premise that it has that right does not make the Board's decision unreasonable, arbitrary, and capricious.

¶ 28 Second, the district court determined that the Board did not act reasonably in making its decision based on aesthetics and the two-business limit. However, the district court's reasoning is suspect because the district court determined that the Board's decision was based on the desire to limit the number of cell phone towers and stated that "[t]he[] other reasons [i.e., aesthetics and the two-business limit] for the denial . . . are essentially just cover for a decision already made." Since the district court believed that aesthetics and the two-business limit were simply "cover" for the Board's decision, it is doubtful that the district court gave those factors due weight. Furthermore, the characterization of these reasons as "just cover for a decision already made" conflicts with the district court's express finding that the Board's actions were in good faith. The district court also appears to have failed to apply the proper presumption under the business judgment rule when analyzing the two-business limit. In applying the business judgment rule, courts generally apply a presumption of reasonableness. *See, e.g.*, *Plumbers Local No. 137 Pension Fund v. Davis*, Civ. No. 03:11-633-AC, 2012 WL 104776, at *6 (D. Or. Jan. 11, 2012) ("In order to overcome the presumption afforded a board's business judgment, the plaintiff must establish, generally, a reasonable doubt that the challenged action was the result of reasonable business judgment."); *Bender v. Schwartz*, 917 A.2d 142, 153 (Md. Ct. Spec. App. 2007) ("'The burden is on the party challenging the decision to establish facts rebutting the presumption' that the directors acted reasonably and in the best interests of the corporation." (citation omitted)). In this case,

---

that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness."). However, the district court appears to have erred in not actually applying the standard it set forth.

however, rather than requiring the Shakespeares to overcome a presumption of reasonableness, the district court appears to have placed the burden on the Association to demonstrate the reasonableness of the Board's action. *See supra* ¶ 24 n.11.

¶ 29 Thus, the reasons supporting the district court's determination that the Board's decision did not satisfy the business judgment rule were fatally flawed, and the district court's determination that "the action was unreasonable, arbitrary, and capricious" cannot stand. As discussed in this opinion, the Board acted within its discretion, and the district court found that the Board acted in good faith. Therefore, even under the formulation of the business judgment standard supported by the Shakespeares (i.e., that decisions "must be reasonable and made in good faith and must not be arbitrary or capricious"), the Board's decision passes muster. *Fink v. Miller*, 896 P.2d 649, 655 n.7 (Utah Ct. App. 1995) (citation omitted).

## IV. TIMELINESS OF THE BOARD'S DECISION

¶ 30  The district court correctly held that the Board's decision was issued within sixty days as required by the CC&Rs. According to section 5.1 of the CC&Rs, the Board has sixty days to "approve or disapprove building plans, specifications, or site plans," and if the Board does not act within that time period, "such approval will not be required." The Board denied the Shakespeares' application on December 10, 2009. The issue is when the application was submitted, starting the sixty-day clock. The Shakespeares argue that everything required for the application was submitted on October 7, 2009, more than sixty days before the Board denied the application.[13] However, the Shakespeares submitted additional materials at a meeting of the Board on October 15, 2009. The district court held that even if the application "were 'submitted' under section 5.1 on October 7," the sixty-day clock "was triggered anew when, at the October 15, 2009 meeting, Mr. Shakespeare presented a previously unsubmitted photograph" and that, therefore, the December 10, 2009 denial was within sixty days. In

---

[13] The Shakespeares provided testimony suggesting that the Board's secretary felt "that their application was sufficient" after the October 7, 2009 submission. This testimony is beside the point, however, because the Shakespeares elected to supplement their application later, on October 15, 2009, which, for reasons discussed herein, reset the sixty-day clock.

construing the CC&Rs, we deem them to grant the Board sixty days to act on such applications. If the sixty-day clock were deemed to start when materials are initially submitted and not restart when the final supplemental materials have been submitted, applicants could supplement or alter their applications at any time after the initial submission and thus deprive the Board of the opportunity to review the application as a whole and make its decision over a period of sixty days. We hold that the application was finally submitted for purposes of section 5.1 of the CC&Rs when the additional materials were submitted on October 15, 2009. Thus, we affirm the district court's holding that the application was denied within sixty days.

## V. ATTORNEY FEES

¶ 31   Due to the district court's errors as discussed above, the grant of 50 percent attorney fees to the Shakespeares is erroneous. The Association was denied its attorney fees because of the district court's erroneous holding that "the Board acted arbitrarily and unreasonably in denying the Shakespeares' application," but as detailed above, the Board acted within its proper authority in denying the application. The Shakespeares were awarded attorney fees due to the "incorrect denial of their application" (but denied full attorney fees because of their "deliberate[] violat[ion] [of] the Restrictive Covenants in constructing the tower"), but again, the Board's denial was not incorrect. Therefore, we strike the attorney fees awarded to the Shakespeares by the district court and remand for a determination of attorney fees in accordance with this opinion.[14]

## CONCLUSION

¶ 32   We reject strict construction of restrictive covenants and hold that restrictive covenants should be interpreted according to the same principles as contracts. Based on our analysis of the CC&Rs for the Fort Pierce Industrial Park under the correct standard, we reverse the district court's holding and instead hold that the Board's denial of the

---

[14] We note that the district court awarded the Shakespeares "50% of the attorney[] fees incurred, plus chargeable costs, and no attorney[] fees to [the Association]" because the Shakespeares "largely prevail under [the district court's] decision." Upon appeal, however, the Association prevails. The district court correctly indicated that if the Association "prevailed, Section 7.4 [of the CC&Rs] would most certainly control, and [the Association] would be entitled to recover."

cell phone tower application at issue in this case was authorized under the CC&Rs. We affirm the district court's grant of summary judgment regarding the timeliness of the Board's denial, holding that it was timely. Finally, we strike the district court's award of attorney fees to the Shakespeares and remand for a determination of what attorney fees to award the Association.

---