**2023 UT App 139**

## THE UTAH COURT OF APPEALS

BEAUTY LAB AND LASER, LLC,
Appellee,
*v.*
RACHELLE JELOSEK,
Appellant.

Opinion
No. 20210719-CA
Filed November 16, 2023

Third District Court, Salt Lake Department
The Honorable Heather Brereton
No. 200900176

Austin B. Egan, Attorney for Appellant

Casey Jones and Scarlet R. Smith,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

LUTHY, Judge:

¶1 Beauty Lab and Laser, LLC (Beauty Lab) "provides a variety of cosmetic, laser, and skincare services, including Botox and lip injections." Rachelle Jelosek is a board-certified family nurse practitioner who worked for a time as Beauty Lab's medical director. Jelosek placed orders for injection products from a company called Allergan. Some orders were for products for Beauty Lab, and some were for products for Jelosek's independent use at an offsite salon (the Salon). When Jelosek stopped working for Beauty Lab, there were four unpaid Allergan invoices (the Invoices) for products that had been shipped to the Salon. Beauty Lab said the Invoices were for products ordered for Jelosek's independent use. Jelosek disagreed and refused to pay

the Invoices. Beauty Lab then paid the Invoices and sued Jelosek for breach of contract.

¶2     The parties filed cross-motions for summary judgment and submitted various declarations and other evidence in support of their motions. Based on the parties' submissions, the district court determined that there was no genuine dispute that the parties had a valid oral contract that Beauty Lab would pay for products ordered for its use and that Jelosek would pay for products ordered for her use. The court further determined that there was no genuine dispute that Jelosek had breached the contract because Beauty Lab produced evidence that the products at issue in the Invoices were retained by Jelosek for her use and Jelosek failed to rebut that evidence. The court therefore granted summary judgment in favor of Beauty Lab, and Jelosek now appeals. We agree that the parties contracted to each pay for the products intended for their own respective uses and that there is no genuine dispute that the products associated with the Invoices were retained by Jelosek for her independent use. We therefore affirm.

BACKGROUND

¶3     Jelosek began working for Beauty Lab in April 2017 as its medical director. Shortly thereafter, Beauty Lab and Jelosek signed an "Independent Contractor Agreement," which described Jelosek's duties as "perform[ing] cosmetic injection beautification services, techniques and procedures on [Beauty Lab] clientele as needed [and] review[ing] client charts and [the] performance of other [Beauty Lab] staff." The Independent Contractor Agreement said that "[f]or all services rendered by [Jelosek] under this agreement," Jelosek would receive "20% of injections sales, and complimentary skincare and laser services."

¶4     In addition to her work for Beauty Lab, Jelosek performed injections for her own clients at the Salon. Jelosek therefore

ordered injection products from Allergan both for Beauty Lab and for her independent use. She ordered the products through a "joint account" with Beauty Lab. As Jelosek explained, "Beauty Lab did not and could not have its own account with Allergan and needed to have a joint account with . . . Jelosek because . . . Jelosek had the medical license credentials." Some of the Allergan products Jelosek ordered were shipped to Beauty Lab, and some were shipped to the Salon.

¶5 In September 2019, Jelosek informed Beauty Lab that she had accepted a position elsewhere. When Jelosek left Beauty Lab, the Invoices reflected an outstanding balance of $26,662 for products that had been shipped to the Salon. Allergan refused to fill future orders for Beauty Lab until the Invoices were paid, and Jelosek was unwilling to pay them. So, Beauty Lab paid the balance and sued Jelosek for breach of contract.

¶6 In its complaint, Beauty Lab alleged that it and Jelosek had "entered into an agreement whereby they agreed[,] among other things, that Jelosek would pay for the injection products ordered from Allergan for injection services that Jelosek performed outside of Beauty Lab's office." Jelosek admitted that allegation in her answer, but she denied Beauty Lab's further allegation that she had "breached the agreement by not paying" for the Invoices.[1]

---

1. Beauty Lab also alleged conversion and, in the alternative, unjust enrichment. Jelosek alleged a counterclaim of wrongful termination. Because we affirm the grant of summary judgment in Beauty Lab's favor on its breach of contract claim, we do not address its alternative claim for unjust enrichment. *See generally United States Fid. & Guar. Co. v. United States Sports Specialty Ass'n*, 2012 UT 3, ¶ 11, 270 P.3d 464 ("A claim of unjust enrichment cannot arise where there is an express contract governing the subject matter of a dispute." (cleaned up)). We also do not address

(continued…)

¶7     Beauty Lab subsequently filed a motion for summary judgment. In support of its motion, Beauty Lab submitted a declaration from one of its co-owners (Co-owner), in which Co-owner stated that "[Jelosek] would pay for the invoices reflecting Allergan products that she ordered to perform her own independent services" and that "Allergan products . . . shipped to [the Salon] were meant only for Jelosek and were to be used for her own independent clients." Co-owner similarly declared that "Beauty Lab would pay for the invoices reflecting Allergan products that were shipped to Beauty Lab's offices." Beauty Lab also submitted the following deposition testimony from Jelosek regarding how Jelosek knew which Allergan products she was to pay for:

> Q: How would we be able to know which invoices Beauty Lab paid for and which ones you paid for?
>
> A: The only way that I would know is if I was given the information from [Co-owner], because I didn't have access to that end of the financial information. I had access to one account that was my ship-to account, but I didn't have access to the financial account.
>
> Q: Did you receive copies of . . . invoices from Allergan?
>
> A: Not until they were sent [to me from Beauty Lab during this litigation]. That was the first time I've ever seen any . . . invoices.
>
> Q: So how would you know how much to pay?

---

Beauty Lab's conversion claim or Jelosek's wrongful termination counterclaim, which were dismissed below, because they are not within the scope of this appeal.

> A: I would log onto . . . the Allergan system, and
> [Co-owner] would tell me what I needed to pay.

Relying on the foregoing evidence, Beauty Lab argued that "it is undisputed that Jelosek was obligated to pay [the Invoices]" because the products associated with the Invoices were "shipp[ed] to [the Salon]."

¶8 Jelosek responded to Beauty Lab's motion and attached her own declaration in which she stated, "I paid invoices for products that I knew to be used for my personal business." But she declared that not all Allergan products shipped to the Salon were for her personal business. Specifically, Jelosek declared that "[s]ome of the product that Allergan shipped to [the Salon] was payment from Beauty Lab in exchange for [her] services" and that "[s]ome of the product that Allergan shipped to [the Salon] was ordered by Beauty Lab to be specifically delivered to [the Salon] so it would receive additional discounts and/or rebates." Jelosek further asserted that "[t]here is no evidence to show that the product [associated with the Invoices] was for [her] personal clients," and she argued that Beauty Lab's motion should therefore be denied.

¶9 Beauty Lab replied and did not dispute for purposes of its motion that sometimes it gave Allergan products to Jelosek as compensation or that sometimes it had Allergan products intended for its use shipped to the Salon. But Beauty Lab submitted another declaration from Co-owner, in which Co-owner declared that Beauty Lab did not order, pick up, or use any of the products associated with the Invoices and that "Beauty Lab did not pay [Jelosek] in product pertaining to [the Invoices]." Beauty Lab then argued that it was entitled to summary judgment because (1) Jelosek had admitted to an oral agreement under which she would pay "for products that [she] knew to be used for [her] personal business"; (2) even if Beauty Lab sometimes had Allergan products intended for its use shipped to the Salon and

sometimes ordered Allergan products that it gave to Jelosek as compensation, Beauty Lab had produced evidence (in the form of Co-owner's declaration) that neither of those things was true with regard to the products associated with the Invoices; and (3) Jelosek had failed to produce evidence to contradict Co-owner's declarations regarding the products associated with the Invoices.

¶10   Jelosek subsequently filed her own motion for summary judgment, relying in part on arguments similar to those in her opposition to Beauty Lab's motion. She also submitted an additional declaration from herself as well as declarations from the owner and a receptionist of the Salon. These declared that Beauty Lab sometimes had Allergan products intended for its use shipped to the Salon for pickup by a Beauty Lab employee. Jelosek also declared, again, that Beauty Lab sometimes "directed Allergan to deliver product to [the Salon] as payment for [her] services." However, none of the declarations Jelosek submitted said anything about the specific products associated with the Invoices.

¶11   The district court held a hearing on the cross-motions for summary judgment. At the conclusion of the hearing, the court ruled that it was "clear" from the pleadings, declarations, and deposition testimony that the parties had agreed that "Jelosek would pay for products that she retained." When it memorialized that ruling in a written order, the court stated that there was no dispute regarding the existence of a valid oral agreement "that Jelosek would pay for products she used for her independent injection services," meaning that she would pay for products she "use[d] or intend[ed] to use."

¶12   The district court acknowledged that Jelosek had produced evidence that "products were on occasion delivered to [the Salon] and then picked up by Beauty Lab." But the court noted that "nowhere" did "Jelosek or any of the other employees of [the

Salon] state that the [products] that are at issue [in the Invoices] . . . were picked up and used by Beauty Lab." The court said "the only fact before" it on this point was Co-owner's declaration "that [Beauty Lab] did not receive that product" and did not intend that product as compensation for Jelosek's services. Thus, the court concluded that there was no genuine dispute that Jelosek had received and retained the specific products associated with the Invoices, and it indicated that whether Jelosek had actually used those products was immaterial. Accordingly, the court concluded that "there is no genuine issue of material fact with respect to Beauty Lab's claim for breach of contract." The court granted Beauty Lab's motion and denied Jelosek's motion. Jelosek now appeals.

## ISSUE AND STANDARD OF REVIEW

¶13 Jelosek argues that the district court erroneously granted summary judgment in favor of Beauty Lab.[2] "We review the summary judgment decision *de novo*." *Salo v. Tyler*, 2018 UT 7, ¶ 19, 417 P.3d 581. A "court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a); *see, e.g.*, *Webster v. Sill*, 675 P.2d 1170, 1172 (Utah 1983).

## ANALYSIS

¶14 Jelosek first asserts that the district court erred in concluding that there was no genuine dispute regarding the existence of a valid oral contract under which Jelosek agreed to pay for Allergan products that she retained. We, however, agree with the district court that the parties had a valid oral agreement

---

2. Jelosek does not contest the denial of her summary judgment motion.

under which Jelosek was obligated to pay for Allergan products that she retained.[3]

¶15    In her answer to Beauty Lab's complaint, Jelosek admitted that "Beauty Lab and Jelosek entered into an agreement whereby they agreed[,] among other things, that Jelosek would pay for the injection products ordered from Allergan for injection services that Jelosek performed outside of Beauty Lab's office." "An admission of fact in a pleading is a judicial admission and is normally conclusive on the party making it." *Stephenson v. Elison*, 2017 UT App 149, ¶ 40, 405 P.3d 733 (cleaned up). "The effect of a judicial admission is that once it has been made, the party cannot present any evidence that contradicts that statement." *Luna v. Luna*, 2020 UT 63, ¶ 27, 474 P.3d 966. While "the rule on binding judicial admissions is not absolute" and a district court has discretion to "relieve a party from the consequences of a judicial admission," *Dale K. Barker Co. PC CPA Profit Sharing Plan v.*

---

3. Beauty Lab asserts that "Jelosek's argument that a meeting of the minds and specific terms were lacking to create a contract [is] unpreserved." We disagree. The district court ruled that Jelosek had a valid oral contract with Beauty Lab under which she would pay for Allergan products that she retained and that, as a matter of law, she breached that contract. Clearly, the issue of the existence of a valid oral contract under which Jelosek had agreed to pay for Allergan products she retained was presented to the court so as to give it an opportunity to rule on the issue, even if some of Jelosek's finer points on the issue are made for the first time on appeal. *See Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 13, 379 P.3d 1218 (determining that "the district court's decision to take up [a] question conclusively overcame any objection that the issue was not preserved for appeal"); *Donjuan v. McDermott*, 2011 UT 72, ¶ 20, 266 P.3d 839 ("The purpose of the preservation requirement is to put the district court on notice of an issue and provide it with an opportunity to rule on it.").

*Turner*, 2021 UT App 119, ¶ 36, 500 P.3d 940 (cleaned up), *cert. denied*, 509 P.3d 768 (Utah 2022), Jelosek never asked the district court to relieve her of this admission. And indeed, she has affirmed this admission on appeal. Accordingly, this admission is conclusive on Jelosek.[4]

¶16    Notwithstanding this admission, Jelosek argues that the parties' agreement required her to pay only for products that she actually used, not for products that she merely retained. She contends that there is a "crucial distinction" between the allegation that she agreed to "pay for the injection products ordered from Allergan for injection services that [she] performed

---

4. We recognize that "[o]nly factual allegations, not opinions or legal conclusions, may be deemed judicial admissions," *1600 Barberry Lane 8 LLC v. Cottonwood Residential O.P. LP*, 2021 UT 15, ¶ 36, 493 P.3d 580, and that we have repeatedly indicated that "the existence of a contract is a legal determination," *e.g.*, *Uhrhahn Constr. & Design, Inc. v. Hopkins*, 2008 UT App 41, ¶ 11, 179 P.3d 808. We have also explained, however, that "[t]he issue of whether a contract exists may present both questions of law and fact, depending on the nature of the claims raised." *Cal Wadsworth Constr. v. City of St. George*, 865 P.2d 1373, 1375 (Utah Ct. App. 1993), *aff'd*, 898 P.2d 1372 (Utah 1995). Here, the sole contested issue regarding the existence of a contract between the parties is whether they reached a meeting of the minds as to who was responsible for which Allergan products ordered through their joint Allergan account, including products that had not yet been injected into clients. And "whether the parties had a meeting of the minds sufficient to create a binding contract is an issue of fact." *LD III, LLC v. BBRD, LC*, 2009 UT App 301, ¶ 13, 221 P.3d 867 (cleaned up). Accordingly, we take Jelosek's admission to an agreement under which she "would pay for the injection products ordered from Allergan for injection services that Jelosek performed outside of Beauty Lab's office" to be a binding judicial admission of fact establishing a meeting of the minds on this issue.

outside of Beauty Lab's office" and the district court's determination that she agreed to "pay for products that she *retained*." (Emphasis added.) "Simply 'retaining product,'" she says, "and using that product for injection services . . . are two different concepts." Although not exactly clear, her argument appears to be that because the admitted allegation uses the past tense "performed," it must be referring to injections already completed. But Jelosek's argument does not hold up to scrutiny because the language of the admitted allegation is susceptible of only one reasonable interpretation: that Jelosek agreed to pay for Allergan products that she retained and, thus, intended to use.[5]

¶17    Again, the admitted allegation states that Jelosek agreed to pay "for the injection products ordered . . . for injection services that Jelosek performed outside of Beauty Lab's office." If the admitted allegation meant that Jelosek agreed to pay only for products she had already used, the past participle "performed" would be accompanied by "had," and the allegation would say that Jelosek agreed to pay for products ordered "for injection services that Jelosek *had performed* outside of Beauty Lab's office." *See The Past Perfect*, Cambridge Dictionary, https://dictionary.ca mbridge.org/dictionary/english/past-perfect [https://perma.cc/X6 4S-EXBD] (explaining that the grammatical form used to indicate that one action in the past "had already finished when another action happened" is called "the past perfect" and "is made with

---

5. Jelosek does not dispute that she continued to perform injection services at the Salon after ending her employment with Beauty Lab, and there is no evidence of a purpose for her to retain Allergan products other than to use them at the Salon. The only reasonable inference from these undisputed facts is that if Jelosek retained Allergan products, then she intended to use them at the Salon. We therefore see no distinction between the district court's oral ruling that Jelosek agreed to pay for products she "retained" and its written ruling that she agreed to pay for products she "intend[ed] to use."

'had' and a past participle"). It was not so constructed and, thus, instead plainly meant that Jelosek agreed to pay for products ordered for the independent injection services she occasionally *performed*, regardless of whether those products had already been used.

¶18 Because this key term of the parties' agreement is memorialized in an after-the-fact admission rather than in a contemporaneous writing, we note that the undisputed extrinsic evidence confirms that the parties understood the terms of the admitted allegation to have its plain and ordinary meaning. *See generally TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) ("Although extrinsic evidence may not be used to interpret an unambiguous contract provision, we have looked to it to confirm that the parties intended for the term to have its plain and ordinary meaning."); *Fox v. Paine*, No. 3187-VCL, 2009 WL 147813, at *5 (Del. Ch. Jan. 22, 2009) ("The court may . . . consult extrinsic evidence secondarily to confirm the conclusion that the contract language is unambiguous, evidencing the shared intent of the parties at the time . . . they entered the contract." (cleaned up)), *aff'd*, 981 A.2d 1172 (Del. 2009); *In re Estate of Schuhmann*, 308 A.2d 375, 379 (N.J. Super. Ct. App. Div. 1973) ("[T]he extrinsic evidence which does appear . . . confirms the unambiguous nature of the instrument . . . .").

¶19 Specifically, Jelosek testified that "[t]he only way" she knew which products she was to pay for was "if [she] was given the information from [Co-owner]" and that "[Co-owner] would tell [her] what [she] needed to pay." Of course, if the trigger for Jelosek's obligation to pay had been her completed performance of outside injections, then Jelosek, not Beauty Lab, would have been the party in possession of the information needed to determine what Jelosek owed. Instead, Beauty Lab, which had access to all invoices and uniquely knew which of them represented products it intended to use, was the party in a position to identify, by eliminating the products intended for its

use, which invoices were for products that had been shipped to the Salon and retained by Jelosek. Thus, the parties' undisputed course of conduct as testified to by Jelosek confirms the plain meaning of the admitted allegation and refutes the contention that Jelosek agreed to pay only for products she actually used.

¶20   Because the plain language of the admitted allegation indicates that Jelosek agreed to pay for Allergan products that she retained and, thus, intended to use, and because the undisputed extrinsic evidence confirms that unambiguous meaning, we affirm the district court's ruling that the parties had an enforceable oral contract under which Jelosek agreed to pay for Allergan products that she retained.

¶21   Finally, we address Jelosek's assertion that the "reasonable inference" from the declarations she submitted "is that not all of the Allergan products shipped to [the Salon] . . . were intended for [her] use" because the declarations indicate that sometimes Beauty Lab had Allergan products intended for its use delivered to the Salon and picked up by a Beauty Lab employee. While Jelosek is correct that the declarations she submitted suggest that not all Allergan products shipped to the Salon were retained by her or intended for her use, this point does not help her avoid summary judgment. That is because Beauty Lab provided evidence—in the form of Co-owner's declaration—that the specific products associated with the Invoices were not among those ordered for Beauty Lab's use or picked up from the Salon by a Beauty Lab employee, and Jelosek produced no evidence to the contrary. *See Webster v. Sill*, 675 P.2d 1170, 1172 (Utah 1983) ("The mere assertion that an issue of fact exists without a proper evidentiary foundation to support that assertion is insufficient to preclude the granting of a summary judgment motion."). The same is true of Jelosek's assertion that Beauty Lab sometimes compensated her with products; Co-owner declared that the products at issue in the Invoices were not intended by Beauty Lab as compensation for Jelosek's services, and Jelosek provided no

evidence to the contrary, so this argument also does not overcome summary judgment. *See id.* Because there is no material dispute that the specific products associated with the Invoices were retained by Jelosek,[6] who refused to pay for them, the court's conclusion that there is no genuine issue of material fact as to whether Jelosek breached the parties' contract is proper, and Beauty Lab was entitled to judgment as a matter of law.

## CONCLUSION

¶22 We agree with the district court that Jelosek had a valid oral contract with Beauty Lab that Jelosek would pay for Allergan products that she retained for her independent use. We also agree that there is no genuine dispute that the products associated with the Invoices were received and retained by Jelosek for her independent use. Jelosek was obligated to pay the Invoices, and she did not. Accordingly, we affirm the court's grant of summary judgment to Beauty Lab for breach of contract.

————————

6. Jelosek argues that because "Beauty Lab did not provide any declaration testimony from anyone who actually observed that product in [the Invoices] . . . [was] 'retained' by Jelosek," "Beauty Lab failed to meet its burden of showing Jelosek 'retained' the product." However, the undisputed facts are that the products associated with the Invoices were delivered to the Salon; Jelosek knew they had been delivered to the Salon; and, although she submitted two declarations of her own, Jelosek never averred that the products did not remain at the Salon. The only reasonable inference to be drawn from these facts is that Jelosek retained the products. *See generally Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 22, 390 P.3d 314 (differentiating between "a reasonable inference and speculation" for purposes of summary judgment).