*This opinion is subject to revision before final publication in the Pacific Reporter*

**2018 UT 04**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

GABLES AT STERLING VILLAGE HOMEOWNERS ASSOCIATION, INC.
*Appellant and Cross-Appellee,*

*v.*

CASTLEWOOD-STERLING VILLAGE I, LLC., [1]
*Appellees and Cross-Appellants.*

No. 20160100
Filed February 9, 2018

On Direct Appeal

Third District, Salt Lake
The Honorable Judge Elizabeth A. Hruby-Mills
No. 100901740

Attorneys:

A. Richard Vial, Edward W. McBride, Jr., Jeffery J. Owens,
David A. Cox, Salt Lake City, for appellants and cross-appellees

Heinz J. Mahler, Shane T. Peterson, and Smith D. Monson,
Salt Lake City, for appellees and cross-appellants Castlewood-
Sterling Village I, LLC, Castlewood Development LLC, Castlewood
Development, Inc., Castlewood Builders, LLC, Richard L. Harris,
and Jeffrey A. Duke

Other Parties to the Proceeding:

Joseph E. Minnock, Anna Nelson, Salt Lake City, for
Lamoreaux Construction Corporation

Albert W. Gray, Michael W. Wright, Sandy, for
B.A. Critchfield Construction, LLC

---

[1] Other parties to this appeal are JEFFERY A. DUKE; DARREN MANSELL; DAN LYBBERT; CASTLEWOOD DEVELOPMENT, LLC; CASTLEWOOD DEVELOPMENT, INC.; CASTLEWOOD BUILDERS, LLC; RICHARD L. HARRIS; and JOHN DOES 1–30.

Susan Black Dunn, Wayne L. Black, Salt Lake City, for
Beus Roofing, Inc.

Elisabeth M. McComber, Douglas P. Farr, Salt Lake City, for
R&JL Siding and Management, LLC

---

JUSTICE PEARCE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUDGE BROWN joined.

Due to her retirement, JUSTICE DURHAM did not participate herein;
and DISTRICT COURT JUDGE JENNIFER A. BROWN sat.

JUSTICE PETERSEN became a member of the Court on
November 17, 2017, after oral argument in this matter,
and accordingly did not participate.

---

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶ 1 Sometime after the property developer who built the Gables at Sterling Village turned that planned unit development over to The Gables at Sterling Village Homeowner's Association (the Association), property owners began to notice problems. Concrete was cracking and buckling. Decks became unsafe to walk on. Stucco began peeling off of the units and stones fell off of pillars. The Association filed this action against the developer, the builders, and their principals alleging, among other things, breaches of fiduciary duty and of the implied warranty of habitability. The property developer asserted a counterclaim for indemnification. The district court granted summary judgment against the Association, reasoning that the Association lacked contractual privity with the property developer. The district court later granted the property developer's motion for directed verdict on the Association's claim for breach of fiduciary duty. None of the Association's claims survived summary judgment or directed verdict. The property developer filed a post-trial motion for indemnification of attorney fees, which the district court granted.

¶ 2 The Association appealed and the property developer cross-appealed. Because we affirm that the district court did not err by granting summary judgment and directed verdict, we do not reach the merits of the property developer's cross-appeal. We conclude, however, that the developer should have tried his indemnification

2

claim rather than raise it by post-trial motion, and we therefore vacate the district court's award of attorney fees. We award the property developer its costs on appeal under rule 34 of the Utah Rules of Appellate Procedure.

## BACKGROUND

¶ 3 Jeffrey A. Duke owned and operated several business entities—Castlewood-Sterling Village I, LLC, Castlewood Development, LLC (collectively, Developer), and Castlewood Builders, LLC. Through these entities, Duke developed the Gables at Sterling Village, a planned unit development comprised of seventy-eight residential units in fifteen buildings. Once construction was complete, Developer drafted and recorded the Declaration of Covenants, Conditions, and Restrictions of the Gables (the Declaration).

¶ 4 Under the Declaration, Developer retained control of the Association until a certain number[2] of units had been sold. At that

---

[2] We use the term "certain number" as a stand-in for the Declaration's formula to calculate when turnover would occur:

> Class A Members shall be all owners other than [Developer] until the Class B membership ceases. Class A members shall be entitled to one (1) vote for each Living Unit or Lot (if no Living Unit is located thereon) owned. The vote appurtenant to each Unit shall have a permanent character and shall not be altered without the unanimous written consent of all Owners expressed in a duly recorded amendment to this Declaration. The vote appurtenant to each Unit may not be divided between multiple Owners of such Unit or between matters which require the vote of the Owners. . . . The Class Member shall be entitled to three (3) votes for each Living Unit or Lot (if no Living Unit is located thereon) owned. The Class B Membership shall automatically cease and be converted to a Class A membership on the first to occur of the following events: (a) When the total number of votes held by all Class A Members equals the total number of votes held by the Class B Member; or (b) The expiration of Seven (7) years after the date on

(continued . . .)

point, Developer turned control of the Association over to its members.

¶ 5 The Declaration gave the Association responsibility for maintaining the common areas and certain parts of the living units:

> The Association shall maintain, repair, and replace all landscaping and improvements in the Common Areas . . . . The Association shall provide exterior maintenance of the Living Units including but not limited to painting, repair, replacement and care of roofs, gutters, downspouts, and exterior building surfaces.

¶ 6 To fulfill its obligation, the Declaration authorized the Association to levy assessments on its members. Additionally, the Declaration gave the Association the authority to use assessment funds to "establish[] and fund[] a reserve to cover major repair or replacement of improvements within the Common Areas." Developer also drafted and recorded the Association's Articles of Incorporation (the Articles). The Articles contained an indemnification provision that provided for indemnification of board members and officers under certain circumstances:

> The Corporation shall indemnify any and all of its officers or members of the Board of Trustees, or former officers or members of the Board of Trustees, or any person who may have actually and necessarily incurred by them in connection with the defense of any action, suit or proceeding in which they or any of them are made parties, or a party, by reason of being or having been members of the Board of Trustees or officers of the Corporation, except in relation to matters as to which any member of the Board of Trustees or officer or former officer or member of the Board of Trustees or person shall be adjudged in such action, suit or proceeding to be liable for negligence or misconduct in the performance of duty.

---

which this Declaration is filed for record in the office of the County Recorder of Salt Lake County, Utah.
Developer is the Class B Member.

¶ 7 Developer turned over control of the Association to its members in 2008. At this point, the Association had $16,581 in its reserve account. After turnover, the Association retained an expert to conduct a reserve study to determine whether Developer had adequately funded the reserve account before handing the Association the reins. The reserve study indicated that by 2009, the reserve account's ideal balance would have been roughly $45,000. But the expert also concluded that the $16,581 starting balance "indicate[d] a fair reserve fund position."

¶ 8 Shortly after the Association took control, a multitude of construction defects manifested themselves, apparently caused by water intrusion into the structural components of the living units. The Association retained a construction expert, who estimated the total cost of repair for the defects in the common areas and exterior surfaces of the units to be about $4,600,000. Over the next several years, the Association levied assessments on its members and paid for various repairs at the Gables with money from the Association's operating and reserve accounts.

¶ 9 In 2010, the Association sued Developer, alleging, among other things, breach of fiduciary duties, breach of contract, breach of express and implied warranties, and joint-venture liability between Developer and Duke. Developer raised a counterclaim for indemnification, arguing that the Articles of Incorporation entitled it to indemnification.

¶ 10 In 2011, Developer filed a third-party complaint against several of the subcontractors, including B.A. Critchfield Construction, LLC (Critchfield), Beus Roofing, Inc. (Beus), and R&JL Siding and Management, LLC (R&JL), alleging breach of contract, negligence, and indemnity.[3]

¶ 11 This matter was heavily litigated with each party filing several pre- and post-trial motions. Three of those motions are relevant to this appeal: Critchfield's motions for summary judgment against the Association and Developer; Developer's motion for a directed verdict; and Developer's post-trial motion for indemnification of attorney fees.

---

[3] For ease of reference, this opinion refers to Critchfield, R&JL, and Beus as Third-Party Defendants unless referring to an argument made by one of the three parties individually.

*Motions for Summary Judgment*

¶ 12 Critchfield moved for summary judgment against the Association, asserting that the Association lacked privity of contract with the Developer and that the Association could not prove a prima facie case of breach of implied warranty. R&JL joined in the motion. Critchfield and Beus moved for summary judgment against Developer on the same or similar grounds.

¶ 13 In response, the Association argued that the Declaration created privity of contract. Two months after filing its opposition to Critchfield's motion for summary judgment, the Association moved for leave to file a supplemental brief. In its proposed supplemental brief, the Association asserted for the first time that the Real Estate Purchase Contracts (REPC) and warranty deeds also created privity of contract between the Association and Developer. The district court denied the Association's motion.

¶ 14 The district court granted Critchfield's motion against the Association and Developer. The district court concluded that the Declaration did not establish privity with Developer, noting that "nothing in the Declaration . . . speaks to whether [the Association] has the right to sue third parties for damages to the 'Living Units' on behalf of the homeowners."[4]

¶ 15 The Association filed a motion for reconsideration, which the district court found was "largely comprised of a recitation of the identical facts, exhibits and legal analysis" that the district court addressed in its original ruling on the motion for summary judgment. The Association also argued that the district court erred in denying its motion for leave to file a supplemental argument. The district court denied the Association's motion to reconsider.

¶ 16 The district court explained that "[t]he parties were given the appropriate opportunity to file dispositive motions and raise any

---

[4] The district court also concluded that the Association had failed to establish two elements of a prima facie case of breach of implied warranty: (1) that the units containing the alleged latent defects were owned by the original homeowners and (2) that the latent defects created a question of safety or made the house unfit for human habitation. The district court granted Beus's motion for summary judgment against the Developer, thereby dismissing the third-party defendants from the lawsuit.

issues or objections to those motions" and the Association sought to supplement its opposition "well after briefing in this matter was complete." The court concluded that "it would be inequitable to allow [the Association] a 'second bite at the apple' to defeat summary judgment based solely on its failure to include a legal argument in support of its Opposition where the underlying facts and law were known at the time of filing the initial Opposition." The district court also explained that consideration of the Association's additional briefing "would not change the Court's ruling," because the REPC did not "indicate any intent by the contracting parties to . . . confer third-party beneficiary status" on the Association.

*Motion for Directed Verdict*

¶ 17 The Association presented its breach of fiduciary duty claims against Developer at trial. Duke, the Gables' property manager, the Association's president, several construction experts, an architectural expert, and a former Association board member testified. At the conclusion of the Association's case, Developer moved for directed verdict on several grounds. The district court granted Developer's motion, concluding that the Association needed expert testimony to establish the standard of care Developer owed to the Association. As the Association had failed to forward any evidence to establish the standard of care, the district court dismissed the Association's claims against Developer with prejudice.

*Motion for Indemnification*

¶ 18 Duke, as the owner and operator of the various Developer entities, filed a post-trial motion seeking indemnification from the Association of his defense costs and attorney fees. Duke asserted that the Association's Articles required the Association to indemnify him for attorney fees and costs because the court determined that he was not liable for negligence or misconduct in the performance of his duty as a member of the board of the Association. The Association argued that Duke's duties stemmed from his role as developer and not as a member of the Association's board, and was therefore not entitled to indemnification. The Association also argued that because "the attorneys' fees and costs are themselves part of the merits of [Duke's] contractual indemnification claim," Duke needed to have raised his indemnification claim at trial. The district court granted Duke's motion, concluding that the indemnification's language provides for the indemnification of "any and all of its officers or members of the Board of Trustees, or former officers or members of the Board of Trustees." The district court reasoned that because

Duke is a former trustee of the Association, he is entitled to indemnification. The district court awarded attorney fees and costs to Duke.

¶ 19   The Association appealed. Developer cross-appealed.

**ISSUES AND STANDARDS OF REVIEW**

¶ 20   The Association raises three issues on appeal.[5] First, the Association argues that the district court erred when it granted Critchfield's motion for summary judgment. We review "a summary judgment for correctness, giving no deference to the trial court's decision." *Bahr v. Imus*, 2011 UT 19, ¶ 15, 250 P.3d 56.

¶ 21   Second, the Association contends that the district court erred when it granted Developer's motion for directed verdict. "This [c]ourt's standard of review of a directed verdict is the same as that imposed upon a trial court." *Merino v. Albertsons, Inc.*, 1999 UT 14, ¶ 3, 975 P.2d 467 (alteration in original) (citation omitted). "A trial court is justified in granting a directed verdict only if, examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." *Id.* "A motion for directed verdict can be granted only when the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted).

¶ 22   Third, the Association posits that the district court erred when it granted Duke's motion for indemnification of his defense costs and attorney fees. "Whether a party may recover attorney fees in an action is a question of law that we review for correctness." *Ault v. Holden*, 2002 UT 33, ¶ 46, 44 P.3d 781.

**ANALYSIS**

I. Motion for Summary Judgment

¶ 23   The Association contends that the district court erred in two ways when it granted Critchfield's motion for summary judgment. The Association first argues that the district court erred

---

[5] Developer raises three issues on cross-appeal, all relating to motions in limine regarding the measure of damages, evidence admitted at trial, and joint-venture liability. Because we affirm the district court's decision to grant summary judgment in favor of the Third-Party Defendants and Developer's motion for directed verdict, we need not reach the issues Developer raises in its cross-appeal.

when it concluded that the Association lacked privity of contract with Developer. The Association asserts that it "enjoys privity of contract with [Developer] through the Declaration and as a third-party beneficiary to the Real Estate Purchase Contracts . . . and deeds between [Developer] and the homeowners." The Association also argues that public policy demands that this Court find that it has privity of contract with Developer.[6]

¶ 24   "[I]n every contract for the sale of a new residence, a vendor in the business of building or selling such residences makes an implied warranty to the vendee that the residence is constructed in a workmanlike manner and fit for habitation." *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, ¶ 55, 221 P.3d 234. To establish a breach of the implied warranty, a plaintiff must show: "(1) the purchase of a new residence from a defendant builder-vendor/developer-vendor; (2) the residence contained a latent defect; (3) the defect manifested itself after purchase; (4) the defect was caused by improper design, material, or workmanship; and (5) the defect created a question of safety or made the house unfit for human habitation." *Id.* ¶ 60.

¶ 25   In addition to the five elements of a prima facie case for breach of the implied warranty, a plaintiff must also show privity of contract with the developer. *Id.* ¶ 63. This requirement stems from Utah code section 78B-4-513, which provides that "an action for defective design or construction may be brought only by a person in privity of contract with the original contractor, architect, engineer, or the real estate developer." UTAH CODE § 78B-4-513(4); *see also Davencourt*, 2009 UT 65, ¶ 57. However, nothing in section 78B-4-513 "precludes a person from assigning a right under a contract to another person, including to a subsequent owner or a homeowners association." UTAH CODE § 78B-4-513(6).

¶ 26   The question before us asks whether the Association can establish privity of contract with Developer. The Association argues that the Declaration, the REPC, the warranty deeds, and public policy could all be used as a basis to establish privity of contract. We

_____

[6] The Association further argues that the district court erred in concluding that the Association's expert report was insufficient to establish a question of safety or habitability. Because we conclude that the Association cannot establish privity of contract, we need not reach the Association's argument regarding the expert report.

hold that the Association has not demonstrated privity of contract, but that holding is in part dictated by the Association's failure to timely raise its REPC/warranty deeds argument below and its failure to challenge directly the district court's decision to not address the untimely argument.

### A. The REPC and Warranty Deeds

¶ 27 The Association argues the REPC and warranty deeds establish privity of contract between it and Developer. In essence, the Association claims it is an intended third-party beneficiary and that status gives rise to privity. Developer argues that the Association failed to properly preserve an argument based upon the REPC and warranty deeds.[7] As previously noted, the Association first raised these arguments in a proposed supplemental brief in opposition to Critchfield's motion for summary judgment. The district court denied the Association's motion to file a supplemental brief and did not consider the arguments contained in that brief. The Association later filed a motion to reconsider the district court's

---

[7] Critchfield also argues that we should dismiss the appeal of the grant of summary judgment in its favor because the appeal is moot. As Critchfield correctly points out, the Association never asserted a cause of action against Third-Party Defendants. Rather, the Association argued that their claim against Developer for breach of implied warranty "pass[ed] through" to Third-Party Defendants. When Critchfield filed a motion for summary judgment against the Association, it simultaneously filed a motion for summary judgment against Developer and relied on the same privity argument in both motions. The district court granted both motions in one order. Developer did not appeal the grant of summary judgment on its claims against Third-Party Defendants. Critchfield argues that because Developer did not appeal the order granting summary judgment, and Developer was the only party that asserted a direct claim against Third-Party Defendants, reversing the court's grant of summary judgment would create "no practical effect or change in the circumstances" with respect to Third-Party Defendants. We agree that because of this posture, no relief we could grant would result in revived claims against Third-Party Defendants. We review the district court's grant of summary judgment in favor of Critchfield only as it relates to the claims between the Association and Developer.

order granting Critchfield's motion for summary judgment and argued that the district court erred in declining to consider the Association's supplemental argument.

¶ 28 The district court denied the Association's motion to reconsider and explained:

> The parties were given the appropriate opportunity to file dispositive motions and raise any issues or objections to those motions . . . . [The Association] filed their initial Opposition on October 11, 2013. It was not until over two months later, on December 18, 2013, that [the Association] sought to supplement its Opposition, well after briefing in this matter was complete and after the Motion was set for hearing. To allow additional briefing at that date was not, as [the Association] suggests, a routine matter with no impact on the parties. Consideration of the new legal theory expounded by [the Association], and allowing the other parties sufficient time to respond thereto would have delayed resolution of the majority of the dispositive motions . . . . Additionally, the court finds that it would be inequitable to allow [the Association] a "second bite at the apple" to defeat summary judgment based solely on its failure to include a legal argument in support of its Opposition where the underlying facts and law were known at the time of filing the initial Opposition.

¶ 29 The district court then briefly addressed the merits of the Association's REPC and warranty deeds argument and explained that "consideration of [the Association's] additional briefing in support of its Opposition would not change the Court's ruling."

¶ 30 On appeal, the Association argues that it is a third-party beneficiary to the REPCs and warranty deeds and that "[i]n granting Critchfield's motion for summary judgment, the trial court failed to recognize privity in this regard and should be reversed." The Association skips a step, however, by jumping straight to the merits of the argument. The district court declined to consider the Association's arguments on summary judgment because they were untimely. The Association must attack that decision before it can level up to the merits.

¶ 31 The district court denied the Association's motion for supplemental briefing. Although the court did not explain its

reasoning at the time, in its order denying the Association's motion to reconsider, the court explained that it denied the Association's motion for supplemental briefing because the motion was untimely and "the underlying facts and law were known at the time" the Association filed its initial opposition. This is the type of decision we leave to the discretion of the district court. *See, e.g.*, *Harvey v. Ute Indian Tribe of Uintah and Ouray Reservation*, 2017 UT 75, ¶ 14, — P.3d — ("We review a district court's denial of a motion to supplement a pleading for abuse of discretion."). The Association has not even attempted to explain how the district court may have abused its discretion in concluding (1) that its supplemental argument was untimely, and (2) that the underlying facts and law were known to the Association at the time it filed its initial opposition.

¶ 32   Nor does the Association assail the motion to reconsider. Indeed, the Association disregards the district court's order denying the motion to reconsider. And again, we review the "denial of a motion to reconsider summary judgment under rule 60(b) of the Utah Rules of Civil Procedure for abuse of discretion." *Lund v. Hall*, 938 P.2d 285, 287 (Utah 1997). "[P]ostjudgment motions to reconsider are not recognized anywhere in either the Utah Rules of Appellate Procedure or the Utah Rules of Civil Procedure." *Gillet v. Price*, 2006 UT 24, ¶ 6, 135 P.3d 861. Accordingly, district courts are under no obligation to consider motions for reconsideration, and a movant has an especially large burden to show that the district court abused its discretion. *Cf. Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 15, 163 P.3d 615 ("Because trial courts are under no obligation to consider motions for reconsideration, any decision to address or not to address the merits of such a motion is highly discretionary."). The district court's ruling may be overturned only if the movant can show that "there is no reasonable basis for the decision." *Id.* ¶ 16 (citation omitted).

¶ 33   If the Association wanted this court to address the merits of its third-party beneficiary argument, then it needed to demonstrate that the district court either abused its discretion in not permitting the supplemental briefing that contained the REPC and warranty deeds argument or that the district court abused its discretion in denying the Association's motion to reconsider. The Association failed to do either. Thus, we decline to address the merits of their REPC and warranty deeds argument. We accordingly limit our analysis to the issue that was before the district court when it

granted summary judgment: that the Declaration creates privity between the Association and Developer.

### B. *The Declaration of Covenants, Conditions, and Restrictions*

¶ 34 The Association argues that the Declaration establishes privity of contract because the Association "received the right (and obligation) to maintain certain common property and accept all owners as members."

¶ 35 Although it is unclear, the Association appears to argue that the Declaration contains an assignment of the homeowners' claims to the Association.[8] The Association cites section 6.1 of the Declaration:

---

[8] The Association also argues that it is a "successor in interest to the Developers vis-à-vis the common property" because "when [Developer] recorded the Declaration, they severed property rights, conveying some to the Association, and some to the Unit purchasers." The Association then references the "right (and obligation) to maintain certain common property." It is unclear whether this argument relates to the argument that the Declaration assigned claims to the Association, which is the argument that the Association made below, appears to renew on appeal, and that we analyze above. The Association's brief may also be read to say that it was granted ownership of the common areas and that it enjoys privity of contract for that reason. To the extent the Association argues that its privity with Developer arises from ownership of the common areas, its argument is unpreserved and inadequately briefed.

Generally, we will not consider an issue unless it has been preserved for appeal. *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828. An issue has been preserved for appeal "when it has been 'presented to the district court in such a way that the court has an opportunity to rule on [it].'" *Id.* (alteration in original) (citation omitted). The Association did not assert this argument below. Nor does the Association assert that an exception to our preservation rule applies. *See State v. Griffin*, 2016 UT 33, ¶ 20, 384 P.3d 186 ("To raise a claim for the first time on appeal, a party must demonstrate that one of the exceptions to our preservation rules apply."). Additionally, this argument consists of three sentences in its opening brief. "[Appellate] courts are 'not a depository in which [a party] may dump the burden of argument and research.'" *2010-1 RADC/CADC*

(continued . . .)

> The Association shall provide exterior maintenance of the Living Units including but not limited to painting, repair, replacement and care of roofs, gutters, downspouts, and exterior building surfaces.

In its opposition to Critchfield's motion for summary judgment, the Association argued that its claims "derive from the duty imposed upon it by the Declaration drafted and recorded by the Developer," and quoted section 6.1 of the Declaration. The Association argued that section 6.1 "grants [it] broad authority to act on behalf of owners in relation to action taken related to damage to association property, expressly the exterior maintenance of the Living Units." The Association does not quote section 6.1 in its opening brief, but does mention its "right (and obligation) to maintain certain common property," and later quotes section 6.1 in its reply brief. Therefore, we assume that the Association's argument on appeal mirrors their argument below: that section 6.1 of the Declaration is an assignment of the homeowners' claims against Developer.

¶ 36  Utah law requires privity of contract to assert a claim for a breach of the implied warranty of workmanlike manner and habitability. Utah Code section 78B-4-513 provides that "an action

---

*Venture, LLC v. Dos Lagos, LLC*, 2017 UT 29, ¶ 32, 408 P.3d 313 (second alteration in original) (citation omitted).

Further, it is unclear which defects, if any, can be found in the common areas. The Association submitted a roughly 1,000-page exhibit to support its memorandum in opposition to Critchfield's motion for summary judgment. Perhaps somewhere in that tome, the Association's expert identified a defect in the common areas. This uncertainty highlights a major problem with the way the Association approached summary judgment. To comply with rule 56 of the Utah Rules of Civil Procedure, a party must "do more than attach evidence and hope the district judge [will] appreciate its significance." *Stitchting Mayflower Mountain Fonds v. United Park City Mines Co.*, 2017 UT 42, ¶ 42, -- P.3d -- (emphasis omitted). Rather, a party must "analyze the evidence to show that it created a genuine issue for trial." *Id.* (emphasis omitted). The Association failed to do this below, and failed to do so on appeal. To the extent there is something in the expert report suggesting that there is a defect to be found in the common areas, the Association waived it before the district court by failing to comply with rule 56.

for defective design or construction may be brought only by a person in privity of contract with the original contractor, architect, engineer, or the real estate developer," but that "[n]othing in this section precludes a person from assigning a right under a contract to another person, including to a subsequent owner or a homeowners association." UTAH CODE § 78B-4-513(4), (6). As noted above, the Association appears to contend that section 6.1 of the Declaration assigns the homeowners' right to sue to the Association.

¶ 37 "Restrictive covenants are a 'method of effectuating private residential developmental schemes' and give property owners in such developments the right to enforce those covenants against others in the development." *Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n. v. Shakespeare*, 2016 UT 28, ¶ 19, 379 P.3d 1218 (citation omitted). "[I]nterpretation of [restrictive] covenants is governed by the same rules of construction as those used to interpret contracts." *Id.* (second alteration in original) (citation omitted). Accordingly, we "interpret the provisions of the Declaration as we would a contract. If the Declaration is not ambiguous, we interpret it according to its plain language." *View Condo. Owners Ass'n v. MSICO, L.L.C.*, 2005 UT 91, ¶ 21, 127 P.3d 697 (citation omitted). Further, "restrictive covenants 'should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created.'" *Fort Pierce*, 2016 UT 28, ¶ 19 (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.1(1) (AM. LAW INST. 2000)).

¶ 38 "It is essential to an assignment of a right that the obligee manifest an intention to transfer the right to another person without further action or manifestation of intention by the obligee." RESTATEMENT (SECOND) OF CONTRACTS § 324 (AM. LAW INST. 1981). "Generally, the elements of an effective assignment include a sufficient description of the subject matter to render it capable of identification, and delivery of the subject matter, with the intent to make an immediate and complete transfer of all right, title, and interest in and to the subject matter to the assignee." 29 WILLISTON ON CONTRACTS § 74:3 (4th ed. 1990) (footnotes omitted). Typical words associated with an assignment include "assumes," "assigns," "transfers," or "conveys." *See Hansen v. Green River Grp.*, 748 P.2d 1102, 1104 (Utah Ct. App. 1988) (noting that a contractual provision lacking the words "assumes," "assigns," "transfers," or "conveys" did not constitute an assignment of a party's rights under a contract).

¶ 39 A recent case before this court highlights the type of language that can assign claims. In *Tomlinson v. Douglas Knight Construction, Inc.*, 2017 UT 56, --P.3d--, the developer assigned its claims against the construction company to the homeowner. *Id.* ¶ 7. The assignment provided that the developer transferred to the homeowner "all . . . right title and interest in and to any and all rights, claims, causes of action, choses in action, rights to payment, and judgments of any kind that [the developer] ha[d] asserted . . . or may otherwise assert" against the builder. *Id.* (second omission in original). Although we ultimately determined that the assignment did not cover the claims that the homeowner brought against the builder, the language of that assignment is illustrative. *See id.* ¶ 21.

¶ 40 In contrast, here, the Declaration states that the Association "shall provide exterior maintenance of the Living Units." The plain language of section 6.1 does not assign the homeowners' claims against Developer to the Association. The language "shall provide exterior maintenance" does not manifest the intent of the homeowner to transfer their right to pursue claims against Developer to the Association. *See* RESTATEMENT (SECOND) OF CONTRACTS § 324. Nor does the language "shall provide exterior maintenance" actually describe the subject matter of the purported assignment: the right to pursue claims against Developer.

¶ 41 Tellingly, section 6.1 does not contain language such as "assumes," "assigns," "transfers," or "conveys"—language traditionally indicative of assignment. *See Hansen*, 748 P.2d at 1104. That is not to say that an assignment must always contain precise, formulaic language. But the language must, at the very least, manifest a homeowner's intent to transfer her right to pursue claims. Accordingly, although we conclude that the statute does not require precise language of assignment, we nonetheless recognize that the statute contemplates an assignment that expresses some intent to actually assign a claim.

### C. *Public Policy*

¶ 42 The Association also argues that public policy favors finding privity. The Association cites *Davencourt* for the proposition that "the scope of the implied warranty should be construed broadly to comport with . . . public policy considerations," and argues that this language indicates that "privity cannot be arbitrarily used to restrict the application of [the] implied warranty or other contract-based claims." Although we may favor a broad construction of the implied warranty, we cannot use public policy to rewrite an

inconvenient statute. Section 78B-4-513 requires contractual privity between the party bringing an action for defective design or construction and "the original contractor, architect, engineer, or the real estate developer" or an assignment of the homeowner's right under the contract. And in *Davencourt*, we made it clear that privity of contract is required to bring a claim for breach of the implied warranty in accord with section 78B-4-513. *See Davencourt*, 2009 UT 65, ¶ 57 & n.13.

¶ 43 The Association raises a compelling argument that our current statutory scheme presents a challenge for homeowners associations attempting to represent their members' interests.[9] Unfortunately, we cannot use public policy to rewrite an explicit statutory requirement. This is especially true where the legislature appears to have built in some protection against the result the Association fears; the statute recognizes that a homeowner can assign her claims to a homeowners association. *See* UTAH CODE § 78B-4-513(6). At oral argument, the Association detailed a number of reasons why an assignment may not be not a practical solution to the problem—but that is an argument better made to the legislature

---

[9] The Association argues that the statute creates the potential for a homeowners association to be left in an unjust and untenable circumstance at turnover. The Association contends that homeowners associations generally have a duty to maintain and repair common areas but cannot fulfill that duty if a developer fails to construct the development in a workmanlike manner and then fails to adequately fund the reserve account. The Association avers that because homeowners associations typically cannot assess units over a specified amount they are left with insufficient funds to carry out their duties, and no avenue to raise those funds. To add insult to injury, an association may have no avenue of recourse against the developer, because, the Association argues, the developer drafts an association's organizational documents and may structure them to prevent the association from having the privity it needs to pursue legal claims against the developer. Thus, says the Association, the party most responsible for the faulty construction can insulate itself from liability. Because the Utah Code establishes the privity requirement that underpins the Association's complaint, its arguments are better directed to the legislature. *See* UTAH CODE § 78B-4-513(4).

to which our constitution has assigned the responsibility of amending and improving statutes.

¶ 44 Because the plain language of section 6.1 does not constitute an assignment of the homeowners' rights, the Association cannot maintain an action against Developer for breach of the implied warranty of workmanlike manner and habitability. Therefore, we need not reach the Association's second argument that the district court erred in concluding that the Association's expert report was insufficient to establish a question of safety or habitability. We conclude that the district court did not err in granting Critchfield's motion for summary judgment.

## II. Motion for Directed Verdict

¶ 45 The Association next contends that the district court erred in granting Developer's motion for directed verdict. The Association argues that "the trial court erred in ruling that expert testimony is required to establish a standard of care for developers for purposes of *Davencourt* limited fiduciary duty claims." The Association argues that because *Davencourt* defined a developer's limited fiduciary duty, the question of whether a developer breached its *Davencourt* duties is within a jury's common knowledge. Developer counters that expert testimony is required to establish the standard of care for a developer upholding the *Davencourt* limited fiduciary duties.

¶ 46 This court has not previously examined when expert testimony is required to establish the standard of care in actions claiming breaches of the fiduciary duties *Davencourt* recognized. We have, however, examined the issue of when expert testimony is required to establish the standard of care in negligence claims. We conclude that our general framework for analyzing the necessity of expert testimony in negligence claims applies in the breach of fiduciary duty context. We begin with a discussion of the background of the *Davencourt* limited fiduciary duties, examine our framework for determining the necessity of expert testimony to establish the standard of care in negligence cases, and conclude with an application of that framework to the facts of this case.

### A. Davencourt Limited Fiduciary Duties

¶ 47 The Association claims that Developer breached several of the limited fiduciary duties established in *Davencourt at Pilgrims Landing Homeowners Association v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, 221 P.3d 234. Generally, the economic loss rule prohibits tort claims for purely economic loss. *Id.* ¶ 18. "The economic loss rule

is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care." *Id.* (citation omitted). The economic loss rule prohibits the recovery of economic losses unless a plaintiff has suffered physical property damage or bodily injury. *Id.*

¶ 48 "Where the economic loss rule is at issue, the 'initial inquiry' becomes 'whether a duty exists independent of any contractual obligations between the parties.'" *Id.* ¶ 27 (citation omitted). "If we find that an independent duty exists under the law, 'the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule.'" *Id.* (citation omitted).

¶ 49 In *Davencourt*, this court recognized several limited fiduciary duties that a property developer owes when the developer establishes and initially controls a homeowners association. *Id.* ¶ 36. Until a developer relinquishes control of a homeowners association to its members, the developer owes the following duties to the association and its members:

(1) to use reasonable care and prudence in managing and maintaining the common property;

(2) to establish a sound fiscal basis for the association by imposing and collecting assessments and establishing reserves for the maintenance and replacement of common property;

(3) to disclose the amount by which the developer is providing or subsidizing services that the association is or will be obligated to provide;

(4) to maintain records and to account for the financial affairs of the association from its inception;

(5) to comply with and enforce the terms of the governing documents, including design controls, land-use restrictions, and the payment of assessments;

(6) to disclose all material facts and circumstances affecting the condition of the property that the association is responsible for maintaining; and

(7) to disclose all material facts and circumstances affecting the financial condition of the association, including the interest of the developer and the developer's affiliates in any contract, lease, or other agreement entered into by the association.

*Id.* (emphases omitted) (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 6.20 (AM. LAW INST. 2000)).

¶ 50 However, "[g]iven the developer's self-interest, '[t]he developer cannot be expected to act solely in the interests for the association and the homeowners. Conflicts of interest are inherent in the developer's role while it retains control of the association.'" *Id.* ¶ 37 (second alteration in original) (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 6.20 cmt. a (AM. LAW INST. 2000)). Accordingly, "[w]hile the developer thus should not be a fiduciary in the broadest sense, . . . the developer's control in [a] nonprofit association requires certain interests of the members and the association be protected" which is "achieved by the limited fiduciary duty." *Id.*

¶ 51 When this court adopted the limited fiduciary duty in *Davencourt*, we recognized that it "constitute[d] a newly-recognized independent duty of care" that stems from a "special relationship" between a developer and an association or its members. *Id.* ¶ 38. The relationship is akin to relationships such as "attorney-client relationship[s], physician-patient relationship[s], or insurer-insured relationship[s]," which also "automatically trigger[] independent duties of care." *Id.* (citation omitted). And "because a limited fiduciary duty constitutes an independent duty of care, tort claims brought under this duty fall outside the scope of the economic loss rule." *Id.*

¶ 52 Breach of fiduciary duty claims generally require proof of four elements: the existence of a fiduciary relationship (such as attorney-client, physician-patient, or insurer-insured); breach of the fiduciary duty; causation, both actual and proximate; and damages. *See Christensen & Jensen, P.C. v. Barrett & Daines*, 2008 UT 64, ¶ 23, 194 P.3d 931 (breach of fiduciary duty in the context of an attorney-client relationship); *see also Regions Bank v. Lowrey*, 101 So. 3d 210, 219 (Ala. 2012) (in the context of a trustee-beneficiary relationship, a claimant must show the existence of a fiduciary duty, the breach of the duty, and damages); *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000) (same, in the context of a physician-patient relationship); *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436

S.W.3d 189, 193 (Ky. 2013) (same, in the context of a board of directors-corporation relationship).

¶ 53 Although the fiduciary duty a developer in control of a homeowners association owes to the association and its members is limited in nature, *Davencourt*, 2009 UT 65, ¶¶ 37–38, the elements of a breach of that fiduciary duty are nonetheless the same. Accordingly, to establish a claim of breach of limited fiduciary duty, a plaintiff must prove: (1) the existence of a developer-association or developer-member relationship; (2) breach of the developer's limited fiduciary duty; (3) causation, both actual and proximate; and (4) damages. *Cf. Christensen & Jensen*, 2008 UT 64, ¶ 23.

¶ 54 The central issue on the motion for directed verdict focused on the appropriate standard of care. The district court granted Developer's motion for directed verdict because the Association failed to "establish[] what the standard of care is for a developer when managing a homeowners association."

### B. Standard of Care

¶ 55 To understand better the standard of care owed in a breach of fiduciary duty case, it is helpful to look to our negligence case law. The essential elements of a negligence claim incorporate virtually the same requirements as a breach of fiduciary duty claim: "(1) a duty of reasonable care owed by the defendant to plaintiff; (2) a breach of that duty; (3) the causation, both actually and proximately, of injury; and (4) the suffering of damages by the plaintiff." *Williams v. Melby*, 699 P.2d 723, 726 (Utah 1985). *Cf. Christensen & Jensen*, 2008 UT 64, ¶ 23 (stating that in the context of legal malpractice, the elements of a negligence claim and a breach of fiduciary duty claim "are substantially the same").

¶ 56 As the Supreme Court of Colorado noted, "[b]reach of fiduciary duty claims are in some, but not all, contexts basically negligence claims incorporating particularized and enhanced duty of care concepts often requiring the plaintiff to establish the identical elements that must be established by a plaintiff in negligence actions." *Martinez v. Badis*, 842 P.2d 245, 251–52 (Colo. 1992) (en banc). The difference between a negligence claim and a breach of fiduciary duty claim therefore lies mainly in the type of duty owed. In a negligence claim, a plaintiff must show "a duty of reasonable care owed by the defendant to [the] plaintiff." *Williams*, 699 P.2d at 726. In a breach of fiduciary duty claim, the plaintiff must demonstrate the existence of a fiduciary relationship between the plaintiff and the defendant, *Christensen & Jensen*, 2008 UT 64, ¶ 23,

which gives rise to a "particularized and enhanced duty of care," *Martinez*, 842 P.2d at 252. *See Duty*, BLACK'S LAW DICTIONARY, (10th ed. 2014) (defining fiduciary duty as "[a] duty of utmost good faith, trust, confidence, and candor owed by a fiduciary (such as an agent or a trustee) to the beneficiary"). Thus, a plaintiff must establish the relevant standard of care to prove a breach of fiduciary duty.

¶ 57  To determine the relevant standard of care in negligence cases, "the essential question is the care that a reasonable person would undertake in the defendant's circumstances . . . ." *Graves v. N. E. Servs., Inc.*, 2015 UT 28, ¶ 37, 345 P.3d 619. "The standard of care in a negligence action is generally a question of fact for the jury." *Id.* "The jury's determination, moreover, is a matter for the commonsense assessment of a lay juror—not expert testimony. This follows logically from the premise of the standard of care in tort." And, "[b]ecause the essential question is the care that a reasonable person would undertake in the defendant's circumstances, we generally leave it to jurors—as ordinary persons representing a particular community—to make that judgment." *Id.* In other words, in a typical negligence case we ask a jury of reasonable people to draw upon their collective expertise to conclude how a reasonable person would have acted in that circumstance.

¶ 58  Our case law recognizes a limited exception to this general rule. Expert testimony is generally required in medical malpractice actions because "unlike the run-of-the-mill negligence case, 'most medical malpractice cases depend upon knowledge of the scientific effect of medicine,' a matter 'not within the common knowledge of the lay juror.'" *Id.* ¶ 38 (citation omitted). But, "where a 'medical procedure is so common or the outcome so affronts our notions of medical propriety' that scientific knowledge is not necessary, 'the plaintiff can rely on the common knowledge and understanding of laymen to establish this element.'" *Id.* ¶ 39 (citation omitted).

¶ 59  "Ultimately, then, the question of the need for expert testimony turns on the nature of the standard to be addressed by the jury." *Id.* ¶ 40. "Questions of ordinary negligence are properly determined by the lay juror without the need for expert testimony. Where the standard implicates scientific matters beyond the capacity of an ordinary juror, however, expert testimony may be required." *Id.* For example, in *Newman v. Sonneberg*, 2003 UT App 401, 81 P.3d 808, the court of appeals held that expert testimony was required to establish the elements of patient abandonment. *Id.* ¶ 16. Because the duty not to abandon care of a patient arises only after treatment or

services have been provided, and "most lay people do not possess the necessary expertise to accurately determine whether [a doctor's] actions constitute[] mere diagnosis or signif[y] the beginning of treatment," expert testimony is required to establish the standard of care. *Id.* ¶¶ 13–15. But no expert is needed when a needle left inside the patient or a drill bit lost down a patient's throat constitutes the alleged negligence. *See Nixdorf v. Hicken*, 612 P.2d 348, 353 (Utah 1980) (holding that expert testimony is not required when a doctor left a needle inside of a patient during surgery); *Kim v. Anderson*, 610 P.2d 1270, 1270–71 (Utah 1980) (holding that expert testimony is not required when a dentist lost a drill bit down a patient's throat).

¶ 60 This general framework lends itself to the breach of fiduciary duty arena. Fiduciary duties may sometimes, but will not always, implicate the type of technical matters that would lie beyond the capacity of an ordinary juror. This means that expert testimony will be required in the breach of fiduciary duty context to explain standard of care and breach issues where the average person has little understanding of the duties owed by particular trades or professions. This testimony may be unnecessary, however, if the professional task is so common or the alleged breach is so egregious that specialized knowledge is not required to conclude that the conduct fell below the applicable standard of care, whatever that standard might be. Accordingly, the question of whether expert testimony is required will necessarily occur on a case by case basis, much as it does in the medical malpractice arena.

¶ 61 Applying this principle to one of the *Davencourt* duties illuminates this distinction. *Davencourt* recognized a duty to "disclose all material facts and circumstances affecting the condition of the property that the association is responsible for maintaining." 2009 UT 65, ¶ 36 (emphasis omitted) (citation omitted). If the alleged breach were to center on a claim that the developer possessed a report that detailed that homes in the planned unit development had been framed with rotting lumber and that the developer could anticipate structures collapsing within a short period of time, the plaintiff would not need an expert to tell the jury that such information would be material to the homeowners association. This is because we trust that a jury can understand why that information would need to be disclosed. If, on the other hand, the allegation were to center on a failure to disclose a technical defect with the type of wiring used in a development, the jury may need an expert to explain why a reasonable developer would have a duty to disclose that information.

*C. The Association's Breach of Fiduciary Duty Claim*

¶ 62   The Association's breach of fiduciary duty claim focused on two of the limited duties *Davencourt* established: (1) "to establish a sound fiscal basis for the association by imposing and collecting assessments and establishing reserves for the maintenance and replacement of common property;" and (2) "to disclose all material facts and circumstances affecting the condition of the property that the association is responsible for maintaining." 2009 UT 65, ¶ 36 (emphasis omitted) (citation omitted). The district court concluded that these duties "fall precisely within the realm of 'specialized knowledge' which is specific to a trade or profession [and] must be established by a witness within the specific profession." On the facts of this case, we agree. This case presents the type of duty and breach issues where the average person has little understanding of the duties owed by particular trades or professions. In this case, expert testimony was required to establish the appropriate standard of care.

¶ 63   The average person likely has little understanding of what a property developer must do to "establish a sound fiscal basis" for a homeowners association. *Davencourt*, 2009 UT 65, ¶ 36 (emphasis omitted) (citation omitted). The Association did not present evidence demonstrating the industry standard for a developer who initially manages the finances of a homeowners association. At trial, the Association only presented evidence about its own financial affairs. The Gables' property manager testified about the Association's initial budget, the financial state of the Association during the years he managed the property, and several of the necessary repairs. The property manager did not testify about how much money an association's reserve fund typically contains at the time of turnover or how much involvement developers typically have in establishing an initial budget—both questions that may be relevant to demonstrating the standard of care a developer owes in establishing a sound fiscal basis for a homeowners association.

¶ 64   In fact, the only evidence presented about the financial state of the reserve account at turnover indicated that it was adequately funded compared to industry standards. At trial, the Gables' property manager testified that the initial budget "was based on building a reserve at a rate sufficient for proper construction." He explained that the set rate was "comparable to the industry average." And the reserve study the Association commissioned after turnover indicated that the starting reserve account balance at the time of turnover "indicate[d] a fair reserve fund position."

¶ 65 The Association did present evidence illustrating the financial state of the reserve account following turnover. But this evidence does not demonstrate conduct so egregious that a lay person would be able to determine whether or not a breach occurred without the assistance of expert testimony. *Cf. Graves*, 2015 UT 28, ¶ 39 ("[W]here a 'medical procedure is so common or the outcome so affronts our notions of medical propriety'" expert testimony is unnecessary. (citation omitted)). The property manager explained that "financially, it [had] been difficult . . . to operate the association in a positive, long-term maintenance fashion because . . . all the expenses [were] going to fix emergencies [and] take care of safety issues." And he explained that due to the construction defects, the Association did not have "the funds to take care of the basic needs" of the Association because they were "responding continually to some new emergency that arises."

¶ 66 Although we can envision a scenario where the financial state of a homeowners association is so dire that a breach can be found without the assistance of expert testimony, we are not presented with that scenario here. The Association presented evidence that operating the Association had been "financially . . . difficult" due to the alleged deficiencies in the reserve account. But the Association also presented evidence that suggested the Association's reserve account "indicate[d] a fair reserve fund position," and that the monthly contribution from homeowners to the reserve account was "comparable to the industry average." Because the Association presented conflicting evidence about its financial state, this evidence did not demonstrate conduct so egregious that a lay person would be able to determine whether or not a breach occurred without the assistance of expert testimony.

¶ 67 Rather than focus on the industry standard pertaining to establishing a sound fiscal basis, the Association argues that "[t]he only expert testimony that would be relevant or helpful to the jury on the question of whether [Developer] established a sound fiscal basis for the Association is expert testimony on the scope and cost of necessary repairs so that the jury could compare that scope and cost with the amounts that were set aside into reserves at the initial established assessment level." At trial, the Association offered expert testimony that the cost of the repairs would be approximately $4,600,000. This argument mischaracterizes the limited fiduciary duty established in *Davencourt*. A developer owes a duty to "establish a sound fiscal basis for the association by imposing and collecting assessments and establishing reserves for the maintenance

and replacement of common property." *Davencourt*, 2009 UT 65, ¶ 36 (emphasis omitted) (citation omitted).

¶ 68 Establishing a "sound fiscal basis" does not necessarily include raising nearly $5,000,000 in funds prior to turnover of the homeowners association. *See id.* As Developer points out, the Association's argument "implicitly requires a jury to accept that a 'sound fiscal basis' includes reserves sufficient to fund the repair of nearly $5 million in alleged latent defects." Although the cost of repairs that the Association was responsible for may well be relevant to determining whether Developer left the Association with a sound fiscal basis, the cost of repairs does not necessarily establish that premise.[10] That is precisely why the Association needed an expert: to opine on what a reasonable developer, knowing what Developer knew or should have known here, would have left in reserve before turning the development over to the Association.

¶ 69 Similarly, the Association argues—albeit briefly—that expert testimony was unnecessary to establish the standard of care a developer must uphold to "disclose all material facts and circumstances affecting the condition of the property that the association is responsible for maintaining." *Id.* (emphasis omitted) (citation omitted). Its argument occupies one paragraph:

> [U]nder *Davencourt*, the developer is required to disclose all material facts and circumstances affecting

---

[10] The Association argues that "[i]t is a simple task for the jury to . . . apply the facts to the law as instructed by the court and compare [the damages] figure with the amounts in the Association's reserve account." But the evidence the Association presented demonstrated that the initial reserve balance was adequate assuming no construction defects manifested themselves. The evidence also demonstrated that the reserve balance was insufficient to cover the expenses of repairing the construction defects. As noted, this evidence relates to the question of breach. However, the jury would not have been able to answer the question of breach without first understanding the appropriate standard of care by which to judge Developer's conduct. The Association did not explain to the jury why the amount of money in the reserve account at the time of turnover was insufficient compared to industry standards because the Association never demonstrated what the industry standards were.

the condition of the property that the association is responsible for maintaining. Either the developer disclosed all of the facts and circumstances or it did not. There is no gray area, and expert testimony should not be required to establish that the developer failed to disclose all material facts and circumstances.

¶ 70   The Association fails to detail what facts and circumstances it claims Developer knew of that it did not disclose. As such, it is difficult to assess precisely whether a jury could have understood the fact or circumstance to be material without the aid of an expert. The *Davencourt* duty requires disclosure of material facts and circumstances. And, as with the "sound fiscal basis," we can envision some facts and circumstances that a jury would be able to understand are material and should be disclosed without the benefit of expert testimony and some that it would not. Stated differently, *Davencourt* imposes a duty to disclose "all material facts and circumstances" and sometimes an expert will be needed to help the jury understand what is and is not material. *Id.* (emphasis omitted) (citation omitted).

¶ 71   Examining all the evidence in a light most favorable to the Association, we conclude that there was no competent evidence that would support a verdict in the Association's favor because the Association failed to establish the relevant standard of care for establishing a sound fiscal basis and failed to articulate the material facts that Developer was required to disclose. *See Merino v. Albertsons, Inc.*, 1999 UT 14, ¶ 3, 975 P.2d 467 ("A trial court is justified in granting a directed verdict only if, examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor."). The facts of this case present the type of duty and breach issues where the average person has little understanding of the standard of care owed by particular trades or professions, and expert testimony was required to establish the relevant standard of care for Developer's duty to establish a sound fiscal basis. Because Developer was entitled to judgment as a matter of law, the district court correctly granted Developer's motion for a directed verdict.[11]

---

[11] The Association also argues that any opinion offered by an expert witness would be objectionable as a legal conclusion on the ultimate issue under rule 704 of the Utah Rules of Evidence.

(continued . . .)

### III. Motion for Indemnification

¶ 72 Finally, the Association contends that the district court erred in ruling that Duke was entitled to indemnification. The Association argues that the indemnification claim was a cause of action that should have been tried to the jury, not asserted by post-trial motion.[12] Duke frames his motion for indemnification as a motion for attorney fees and argues that "there is no issue of entitlement to attorney fees to submit to the jury."

¶ 73 We have recognized that motions for attorney fees, when based in contract or on a statutory right to attorney fees, may be properly raised in a post-trial motion. In *Meadowbrook, LLC v. Flower*, we established a "narrowly tailored" rule that "a prevailing party that files a motion for attorney fees before signed entry of final judgment or order does not waive its claim to such fees, unless otherwise provided by statute or unless it fails to comply with the court's order to address the issue at a specific time." 959 P.2d 115,

---

Developer responds that "[e]xpert testimony . . . is required to establish the standard similarly situated developers must uphold." Developer argues that "[t]he proffered [expert] testimony [would not be] a legal conclusion; rather, it informs the trier of fact with regard to the standard a reasonable developer is required to uphold under similar circumstances." Developer is correct. As we have explained above, expert testimony was required to establish the appropriate standard of care associated with the *Davencourt* duties. Although we can see that an expert could cross the line into territory that Utah Rule of Evidence 704 places out of bounds, we cannot assume that an expert necessarily would. The expert testimony contemplated by the district court pertained only to the standard of care, and accordingly would not automatically constitute a legal opinion on the ultimate issue under Utah Rule of Evidence 704. The proper objection would be to the specific opinion the expert rendered and not to all testimony on the topic of the standard of care.

[12] The Association also argues that the indemnification clause found in the Articles does not apply in this case because [Developer's] independent fiduciary duty is distinct from a corporate fiduciary duty and that the indemnification clause should not be enforced as a matter of public policy. Because we conclude that the indemnification claim was an abandoned counterclaim, we need not address the Association's alternative arguments.

119–20 (Utah 1998). In the prevailing party attorney fee context, this rule is logical because "in most instances, requiring all parties to present evidence of attorney fees to a jury before resting their cases would contravene judicial economy. Where a contract or statute provides for attorney fees to the prevailing party, a party does not even become entitled to such fees until the jury has determined which party has prevailed in the case." *Id.* at 117. Additionally, "the determination of reasonable attorney fees is an issue generally left to the sound discretion of the trial court, not the jury." *Id.*

¶ 74 The policies we relied upon in *Meadowbrook* to craft a "narrowly tailored" exception to the general rule illustrate why after trial was not the appropriate time for Duke to seek indemnification. *Id.* at 119. First, no statute or contract between Duke and the Association formed the basis of Duke's attorney fees claim. Rather, he argued that a provision of the Articles, a governing document ancillary to the underlying cause of action, entitled him to indemnification.[13]

¶ 75 Nor does the second policy consideration in *Meadowbrook* resonate here, because although "the determination of reasonable attorney fees is an issue generally left to the sound discretion of the trial court," that was not the only determination to be made in this case. *Id.* at 117. "[T]he issue of attorney fees is generally ancillary to the underlying action," and accordingly "a trial court's decision regarding the award of such fees normally requires an inquiry separate from the main cause of action to be proved at trial—'an inquiry that cannot even commence until one party has "prevailed."'" *Id.* at 118 (quoting *White v. N.H. Dep't of Emp't Sec.*, 455 U.S. 445, 452 (1982)). In a prevailing party scenario, the validity of the contract or applicability of the statute has already been determined at trial. But in a case based on an indemnity provision in a document other than the contract at the heart of the litigation, there may be other arguments to consider.

---

[13] On these facts, Duke's claim resembles a prevailing party claim because the Association and Duke were the parties before the district court. But it is not difficult to imagine a situation where an individual homeowner brings the claim against the developer. In such a case, the developer would undoubtedly need to assert a cause of action against the homeowners association to obtain indemnification.

¶ 76   Here, Duke's counterclaim was predicated on the theory that indemnification was an item of consequential damages flowing from the Association's breach of fiduciary duty claim. Accordingly, before the district court could determine reasonable attorney fees, Duke still needed to prove that he was entitled to the fees in the first place. *Cf. Canyon Country Store v. Bracey*, 781 P.2d 414, 419–20 (Utah 1989) (holding that when the recovery of attorney fees is predicated on a theory that the fees are an item of consequential damages flowing from a breach of contract, the issue may be properly submitted to a jury as part of a party's case-in-chief). A post-trial motion is not the appropriate vehicle to litigate a claim for fees not based upon a statute or prevailing party attorney fees clause.

¶ 77   Duke asserted a "cause of action for indemnification" in his answer to the Association's complaint. Developer "pray[ed] for judgment against the Association . . . [f]or the costs associated with defending themselves in this action and attorney's fees incurred herein." Duke made no mention of the indemnification claim at the pretrial conference, nor in the proposed jury instructions. By failing to pursue his counterclaim against the Association at trial, Duke waived his counterclaim for indemnification. *Cf. Barnard v. Wassermann*, 855 P.2d 243, 247–48 (Utah 1993) (holding that failure to pursue objections to an order in the district court amounted to waiver of a claim raised by plaintiff). The district court improperly addressed his claim for indemnification in a post-trial motion for attorney fees. Our narrow holding in *Meadowbrook* does not apply to this claim for indemnity arising out of the Articles. Accordingly, we reverse the district court's award of indemnification of attorney fees and remand for proceedings consistent with this portion of the opinion.

## CONCLUSION

¶ 78   We conclude that the plain language of the Declaration does not constitute an assignment of the homeowners' rights and therefore the Association cannot maintain an action against Developer for breach of the implied warranty of workmanlike manner and habitability. Accordingly, we hold that the district court correctly granted summary judgment in favor of Critchfield. We next conclude that the facts of this case present the type of duty and breach issues where the average person has little understanding of the duties owed by particular trades or professions, and expert testimony was required to establish the relevant standard of care. Accordingly, Developer was entitled to judgment as a matter of law,

and we hold that the district court correctly granted Developer's motion for a directed verdict. Finally, we conclude that the district court improperly addressed Duke's indemnification claim in a post-trial motion for attorney fees and accordingly erred when it granted Duke's motion for attorney fees. We reverse the district court's award for indemnification of attorney fees and remand. Duke requests costs on appeal. Because we affirm the district court's grant of summary judgment and the directed verdict in favor of Developer, we award Duke his costs on appeal. *See* UTAH R. APP. P. 34(a).

———————————